**ROCKWELL INTERNATIONAL CORP., Plaintiff**

v.

**The UNITED STATES, Defendant**

**and**

**SDL, Inc., Third–Party Defendant.**

**No. 93–542C.**

United States Court of Federal Claims.

Feb. 5, 1997.

As Amended April 1, 1997.

**480**

John F. Lynch, Houston, Texas, attorney of record for plaintiff. L. Gene Spears, of counsel.

Chun–I Chiang, Washington, D.C., attorney of record for defendant, with whom was Assistant Attorney General Frank W. Hunger. John Fargo & James E. Hopenfeld, of counsel.

Preston Moore, San Francisco, California, attorney for third-party defendant SDL, Inc. Michael M. Carlson, Marc J. Pernick & W. Douglas Carothers, Jr., of counsel.

## MEMORANDUM OF DECISION

HARKINS, Senior Judge.

Rockwell International Corporation (Rockwell) seeks compensation for alleged infringement of U.S. Patent No. 4,368,098 (the '098 patent). Rockwell's '098 patent is directed to an organo-metallic process for producing epitaxial films of Group III–V semiconductor on a single crystal substrate. The process claimed in the '098 patent is referred to as metal organic chemical vapor deposition (MOCVD), metal organic vapor phase epitaxy (MOVPE), organo metallic vapor phase epitaxy (OMVPE), or organo metallic chemical vapor deposition (OMCVD). For convenience, MOCVD will be used to identify the process claimed in the '098 patent.

Rockwell's complaint filed on August 30, 1993, alleges that various Government procurements of image intensifying tubes for night vision equipment, photo voltaic cells, laser diodes and other devices involved development and/or manufacture using methods covered by the claims of the '098 patent. Rockwell's action involves the validity of the '098 patent, infringement issues, and amount of compensation, if any, due.

The complaint identifies 16 contractors alleged to have participated in procurements of items covered by claims of the '098 patent. Spectra Diode Laboratories, Inc. (now SDL, Inc.) was named as a supplier of laser diodes in United States procurements. Pursuant to RCFC 14(a)(1) & (c) defendant United States issued notices to 37 companies, and a notice was served upon SDL, Inc. on March 28, 1994.[1] Initially, SDL did not make an appearance under the RCFC 14 notice on the ground that its potential liability as an indemnitor was not sufficiently substantial to justify the legal fees and expenses that could result. On May 22, 1995, however, Rockwell instituted a case in the Northern District of California alleging infringement of the '098 patent in SDL's manufacture of products for sale to customers other than the United States by use of the MOCVD process.[2] On June 22, 1995, SDL moved to intervene as a party defendant under RCFC 24(b). SDL satisfied all the enumerated conditions for permissive intervention under RCFC 24(b)(2) and other factors, particularly savings of judicial resources that could result by avoidance of multiple lawsuits on the same issues, warranted intervention. On August 17, 1995, SDL's motion was allowed, and SDL thereafter participated as a third-party defendant.

Prior to the date SDL was permitted to intervene, Rockwell and defendant United States had recommended and obtained on October 3, 1994, a scheduling order that provided proceedings in this case are not to follow the traditional approach of bifurcating trial of liability issues and damages issues. By agreement of the parties, trial in this lawsuit is to proceed in sequences based on

---

1. See *Rockwell International Corp. v. United States,* 31 Fed.Cl. 536 (1994).

2. *Rockwell v. SDL, Inc.,* No. C95–01729 MHP, N.Dist. Calif. On Sept. 15, 1995, the district court case was suspended pending disposition of validity issues in this action.

equipment categories: (1) night vision equipment; (2) photo voltaic cells; and (3) laser diodes and semiconductor devices. During each trial phase, all liability and damages appropriate to the relevant category are to be tried.

Rockwell's complaint as to night vision equipment (paragraphs 6–8), photo voltaic cells (paragraphs 9–12), and laser diodes (paragraphs 12–14), asserts that the use, manufacture, or development of such equipment is described in and covered at least by independent claims 1–3 of the '098 patent. Defendant United States as a defense asserts that claims 1, 2 and 3 of the '098 patent are invalid under 35 U.S.C. §§ 102, 103 and 112. SDL asserts as an affirmative defense that the claims of the '098 patent are invalid on one or more grounds specified in 35 U.S.C. §§ 101, 102, 103 and 112.

The validity of the '098 patent, and the construction of its claims, will be decided in the first trial phase for all subsequent trial phases. Discovery prior to the initial trial phase includes discovery directed at patent validity issues as well as discovery on infringement and damages issues specific to night vision equipment. Infringement and damages issues as to the equipment category applicable to SDL will be decided in the third trial phase. All defenses relating to the validity of the '098 patent are to be tried in the first trial phase. A decision on the validity of the '098 patent, and construction of its claims, favorable to plaintiff would foreclose relitigation of these issues in subsequent phases.

SDL's defenses involve four questions of law and fact in common with the main case; two of which (validity of the '098 patent and claim construction) will be determined in the first trial phase. SDL, as a third-party defendant, participates with defendant United States in the first trial phase on validity and claim construction issues.

Discovery on all issues in phase one has been completed and the case came before the court on cross-motions filed during the period March 15, 1996, to August 19, 1996. Rockwell has moved for summary judgment that claims 1 and 3 of the '098 patent are not invalid. SDL opposes Rockwell's motion and, by cross-motion, asserts that claims 1, 2, 3, 11, 35, 40, 44, 50, 55, 56, 57, 58, 66 and 72 of the '098 patent are invalid. Defendant United States opposes Rockwell's motion and, by cross-motion, asserts that claims 1, 2, 3, 11, 35, 40, 44, 50, 55, 56, 57, 58, and 72 of the '098 patent are invalid.

A bench ruling was issued after oral argument on November 14, 1996. Counsel were told that a written decision would be issued subsequently, with appeal time to run from the date the written decision was filed. The ultimate conclusions to be reached in the decision were announced, and the framework for the decision on claim construction issues, and obviousness under 35 U.S.C. § 103, were stated on the record. The elements of claim No. 1 as construed were stated on the record. Counsel were told that the final decision would include the following rulings:

Plaintiff's motion for summary judgment that claims 1 and 3 of patent '098 are not invalid will be denied.

Defendants' motions for summary judgment on anticipation under 35 U.S.C. § 102 will be denied.

Defendants' motions for summary judgment on obviousness under 35 U.S.C. § 103 will be allowed.

Defendant United States and third-party defendant SDL, Inc. will be entitled to judgment under 35 U.S.C. § 103.

## I

### *Summary Judgment*

Summary judgment under RCFC 56(c) shall be rendered forthwith "if the pleadings, depositions, answers and interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." The nonmoving party, under RCFC 56(f), by affidavits or as otherwise provided in the rule "must set forth specific facts showing there is a genuine issue for trial."

Summary disposition is appropriate to isolate and dispose of factually unsupported claims or defenses when there are no genu-

ine disputes as to any material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir. 1987). The movant has the burden of demonstrating that there are no genuine issues of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). After adequate time for discovery and on motion, the movant can meet this burden by establishing that there is an absence of evidence on an essential element of the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). The non-movant must respond by producing affirmative evidence that a genuine issue of material fact does exist, and such an issue is determined to be genuine if a reasonable jury could resolve a factual matter in the non-movant's favor. *Sweats*, 833 F.2d at 1562. Doubts as to whether there are material factual issues in dispute are to be resolved in the light most favorable to the party opposing the motion for summary judgment. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). "In order to defeat a motion for summary judgment, the non-moving party must demonstrate more than some metaphysical doubt as to the material facts, instead it must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

Summary judgment is as appropriate in a patent case as in any other. *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed.Cir.1994). Claim construction can be decided by summary adjudication. Under *Markman v. Westview Instr., Inc.*, 52 F.3d 967 (Fed.Cir.1995), *aff'd*, — U.S. —, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), "[t]he interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court." 52 F.3d at 970–71. *Markman* recognized that, in construing claim language, the proper "focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean" in light of the entire specification and prosecution history. *Id.* at 986. The *Markman* rule has been applied in summary disposition in a patent case, including affirmation of the district court's claim construction. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed.Cir.), *cert. denied*, — U.S. —, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995).

Validity of a patent may be resolved under the summary judgment rule. *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1573 (Fed.Cir. 1985). When the factual inquiries into obviousness present no genuine issues of material facts, summary judgment may be granted as a matter of law. *Ryko Mfg. Co. v. Nu–Star, Inc.*, 950 F.2d 714, 716 (Fed.Cir.1991). Invalidity by anticipation may be resolved by summary judgment. *Chore–Time Equip. Inc. v. Cumberland Corp.*, 713 F.2d 774, 778–79 (Fed.Cir.1983).

Burden of proof plays an enhanced role in summary judgment motions in patent cases. Patents are presumptively valid. 35 U.S.C. § 282. To overcome this burden the party asserting invalidity or obviousness must establish all of their evidence by a clear and convincing standard. *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed.Cir.1993). "A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt." *Id.* (citing *Buildex, Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed.Cir.1988)). "'Clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'" *Id.* at 1191 (citing *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 2437–38, 81 L.Ed.2d 247 (1984)). This burden of proof is not altered by the fact that the litigants are involved in a summary judgment motion. SDL and defendant United States, for a favorable ruling on their cross-motions, must present clear and convincing

evidence adequate to overcome the presumption.

When a validity challenge is based on obviousness, and prior art not considered by the PTO examiner is presented, the burden due to presumed validity is altered. "When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the *added* burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984) (emphasis added). But when an attacker "produces prior art or other evidence not considered in the PTO, there is, however, no reason to defer to the PTO so far as its effect on validity is concerned." *Id.* The standard of proof does not change. "[I]t must be by clear and convincing evidence or its equivalent." *Id.* at 1360. "What the production of new prior art or other invalidating evidence not before the PTO does is to eliminate, or at least reduce, the element of deference due the PTO, thereby partially, if not wholly discharging the attacker's burden, but neither shifting nor lightening it or changing the standard of proof." *Id.* "The evidence may, therefore, carry more weight and go further toward sustaining the attacker's unchanging burden." *Id.*

The parties' summary judgment motion papers includes the documentation relative to factual contentions that are required by RCFC 56(d): Proposed Findings of Uncontroverted Fact (material facts in support of the respective motions) and Statement of Genuine Issues (movant's facts as to which there is genuine dispute). This documentation was prolific with minutiae and voluminous. Rockwell supported its summary judgment motions with 125 findings of uncontroverted fact, of which 51 were undisputed by defendant United States, and 49 of which were undisputed by SDL. SDL's cross-motion for summary judgment was supported by 349 proposed findings of uncontroverted fact, of which 48 were uncontested by Rockwell. Defendant United States supported its cross-motion for summary judgment with 270 proposed findings of uncontroverted fact, of which 142 were uncontested by Rockwell.

In the disposition of these motions for summary judgment, not all of the issues that have been raised are subject to summary disposition under the foregoing standards. Those facts that are material to the issues on which summary judgment is allowed are set forth below. Material facts that are in dispute that preclude summary disposition of issues raised by a movant are identified.

Perspective on claim construction and obviousness issues is provided by the following chronological background of the relevant technology involved, and the prosecution of the '098 patent.

### Background of Relevant Technology

Chemical vapor deposition (CVD) is a process for depositing a thin film of material by transporting the constituent elements of that material in gaseous form. CVD can be used to grow semiconductor materials. The earliest semiconductor CVD processes were used to grow silicon. For many purposes, semiconductor material is most useful if it is single crystalline. Single crystals are solids in which every individual atom has a specific position with regard to other atoms. The utility of single crystalline semiconductor material was known to those skilled in the art of chemical vapor deposition in the early 1960s.

CVD processes are used to produce thin single crystalline films called epitaxial films. To grow single crystalline films, the substrate must be a single crystal to serve as a template for the film being formed, *i.e.*, to define the position of the atoms to be deposited on the substrate. Prior to the '098 patent, other CVD processes had been used to grow III/V semiconductors. The '098 patent claims a method for making III/V semiconductor material by a CVD process.

The '098 patent identifies specific groups of reactants to be used in a CVD process. The reactant supplying the Group III element to the III/V semiconductor is to be an

organometallic alkyl. Claim 2 of the patent specifies that the Group V reactant is to be a halide-free reactant, while claims 1 and 3 specifically require that it be either an alkyl or a hydride.

The experiments that led to the '098 patent were conducted by Harold Manasevit and William Simpson, both employees of Rockwell. Dr. Manasevit and Mr. Simpson's first MOCVD experiment was performed on February 6, 1967. Mr. Simpson successfully deposited an epitaxial layer of gallium aresenide on a single crystal substrate on February 7, 1967, on his fifth experiment trying to grow III/V semiconductors by the MOCVD process. In the February 7, 1967, experiment which resulted in epitaxial growth of gallium arsenide by MOCVD, triethylgallium and arsine were used as the Group III and Group V reactants, respectively.

### Prosecution of the '098 Patent

Dr. Manasevit filed an application for a patent on February 13, 1968 (original application) which was given Serial No. 705,213. Application Serial No. 705,213 was abandoned by Dr. Manasevit.

On October 1, 1969, Dr. Manasevit filed a continuation-in-part (CIP) application of Serial No. 705,213, which was given Serial No. 64,835. The CIP application added matter which was not present in the original application. The CIP application (Serial No. 64,835) was abandoned by Dr. Manasevit.

On August 2, 1973, Dr. Manasevit filed a continuation application of Serial No. 64,835, which was given Serial No. 385,028. Application Serial No. 385,028 was abandoned by Dr. Manasevit.

On April 7, 1978, Dr. Manasevit filed a continuation application of Serial No. 385,028, which was given Serial No. 894,367 (the '367 application).

On September 24, 1979, the first Patent Examiner mailed the First Office Action, dated September 18, 1979, in connection with the '367 application. In the First Office Action, Examiner rejected all remaining claims in the '367 application. The remaining claims were 19–70 and 93–101. Claims 70–79, 87–94, 100 and 101 were rejected in the First Office Action under 35 U.S.C. § 103 as

being unpatentable over U.S. patent No. 3,218,205 (the Ruehrwein '205 patent). Claims 19–70 were rejected under 35 U.S.C. § 103 as being unpatentable over U.S. patent No. 3,364,084 (the Ruerhwein '084 patent). In response to the First Office Action, Dr. Manasevit, through his attorney, on January 24, 1980, filed an Amendment (response to First Office Action). The response to the First Office Action contended that the Examiner's wholesale rejection of all pending claims was inappropriate and stated that, among other missing elements, the Ruehrwein '084 patent, unlike Dr. Manasevit's, did not contain the element of a single heated zone.

On April 25, 1980, the second Patent Examiner mailed a Second Office Action dated March 28, 1980, in connection with the '367 application. On July 3, 1980, Dr. Manasevit, through his attorney, filed a response dated June 25, 1980, to the Second Office Action.

On September 18, 1980, the second Patent Examiner issued a Third Office Action dated September 8, 1980, in connection with the '367 application. In the Third Office Action, claims 19–47, 58–68, 69, 73–82, 83–85 and 87–91 of the '367 application were rejected under 35 U.S.C. § 103 as unpatentable over the Ruehrwein '084 patent. The basis for this rejection was that those claims were obvious. On March 2, 1981, Dr. Manasevit, through his attorney, filed an Amendment dated March 2, 1981, in response to the Third Office Action. In the response to the Third Office Action, Dr. Manasevit argued that his process, unlike the process disclosed in the Ruehrwein '084 patent, used an open reactor. An open reactor is one through which gases flow during the CVD process.

In the response to the Third Office Action, Dr. Manasevit distinguished his process from the process in the Ruehrwein '084 patent by stating that the Ruehrwein patent involved "the so-called 'hot wall' type reaction. By contrast the present process discloses the use of a 'cold wall' process." The statement made by Dr. Manasevit regarding the distinction between his process and the Ruehrwein '084 patent process based on the type of reactor used applies to the claims which eventually became independent claims 1, 2

and 3 of the '098 patent. The use of the term "single heated zone" is understood by those skilled in the art to refer to a cold-wall reactor.

In the response to the Third Office Action, Dr. Manasevit stated, "[s]ee the article by Stringfellow, et al., *supra*, at pages 50 and 54 which discuss and distinguish cold wall versus hot wall apparatus and related organometallic processes." The reference to an article by G. Stringfellow and H. Hall, made by Dr. Manasevit in the response to the Third Office Action, was a reference to the article, G.B. Stringfellow and H.T. Hall, *VPE Growth of $Al_xGa_{1-x}As$*, 43 J. CRYSTAL GROWTH 47 (1978) (Stringfellow and Hall). Dr. Manasevit adopted the definition of a cold-wall reactor from the Stringfellow and Hall article.

The Stringfellow and Hall article states that two distinct growth systems have been used for the VPE growth of $Al_xGa_{1-x}As$. The first is a cold wall system where "only the graphite pedestal is heated by induction heating and the $SiO_2$ walls remain cool even though no special water or forced air cooling is employed." The other is a hot wall system in which "the gases are surrounded by hot graphite walls from the point of mixing to the substrate. The outside $SiO_2$ walls remain cool."

The statements made in the Stringfellow and Hall article regarding the definitions of a hot-wall and a cold-wall reactor can be summarized as defining a cold-wall reactor as a reactor in which the walls of the reaction chamber are kept cool enough to avoid significant pyrolysis of the reactants on or near the walls of the reactor.

On May 4, 1981, Dr. Manasevit, through his attorney, filed a supplemental response to the Third Office Action to supplement the March 2, 1981, Amendment. This document provided a further response to the Third Office Action. In his supplemental response to the Third Office Action, Dr. Manasevit withdrew his earlier arguments that his process was distinguishable over the Ruehrwein '084 patent because the Ruehrwein patent disclosed a closed reactor as opposed to the open reactor used by Dr. Manasevit. The supplemental response stated that he did not rely on the open versus closed system as a basis for patentably distinguishing over Ruehrwein.

The examples in the Ruehrwein '084 patent, considered in the context of the entire patent, disclose sufficient information for one skilled in the art to achieve epitaxial growth of III/V compounds using the halide process described in the Ruehrwein '084 patent. Numerous persons had achieved a thin epitaxial III/V film on various substrates before Dr. Manasevit, using the process described in the Ruehrwein '084 patent and other CVD methods including one known as the chloride transport method.

The '367 application eventually was allowed and issued as the '098 patent on January 11, 1983.

## II

### Claim Construction

Before the validity of the '098 patent can be determined, the meaning of the claims must be defined. The first step in any patent invalidity or infringement action is claim construction. *Beachcombers v. WildeWood Creative Products, Inc.,* 31 F.3d 1154, 1160 (Fed.Cir.1994); *Lemelson v. General Mills, Inc.,* 968 F.2d 1202, 1206 (Fed.Cir.1992), *cert. denied,* 506 U.S. 1053, 113 S.Ct. 976, 122 L.Ed.2d 131 (1993). The terms "claim construction" and "claim interpretation" can be, and are, used interchangeably in patent opinions. Although there has been debate as to whether claim construction is a question of law or a mixed question of law and fact, the Federal Circuit and more recently the Supreme Court specifically have held that claim construction is a pure question of law. *Markman,* 52 F.3d at 977; *see also Lemelson,* 968 F.2d at 1206; *Intervet America, Inc. v. Kee–Vet Laboratories, Inc.,* 887 F.2d 1050, 1053 (Fed.Cir.1989). "The patent is a fully integrated written instrument ... It follows, therefore, from the general rule applicable to written instruments that a patent is uniquely suited for having its meaning and scope determined entirely by a court as a matter of law." *Markman,* 52 F.3d at 978. Thus, construction of the claim in patent '098

is appropriate under summary judgment standards.

If at all possible, a patent should be construed by the court so as to sustain its validity. *No. American Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed.Cir.1993), *cert. denied*, 511 U.S. 1069, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994). The construction given the patent by the court will be the tool that will define the scope of the patented invention for all subsequent litigation. *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 619 (Fed.Cir.1995). "When a court construes the claims of the patent, it 'is as if the construction fixed by the court had been incorporated in the specification,' and in this way the court is defining the federal legal rights created by the patent document." *Markman*, 52 F.3d at 978 (citing CURTIS ON PATENTS, § 452 at 609).

■ Both Rockwell and SDL state that some issues applicable to validity have been conceded only for the purpose of permitting claim construction under summary judgment standards. These attempts to reserve validity issues during claim construction are in error. The interpretation of the patent claims determined pursuant to these cross-motions for summary judgment will apply to and be used for resolving validity issues, as well as all infringement issues in the remaining sequences of this litigation. *Bell Communications*, 55 F.3d at 619; *Lemelson*, 968 F.2d at 1206 n. 4; *Intervet*, 887 F.2d at 1053; *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 859 F.2d 878, 882 (Fed.Cir. 1988). A patent can have only one construction; it is a written document analogous to a statute. *Markman*, 52 F.3d at 987. Just as statutes can have only one meaning and interpretation, patents can have only one meaning or interpretation. The determination made by the court at this juncture will be binding on all parties for the remainder of this litigation.

Claims of a patent are construed by looking first to intrinsic evidence, and then, if needed, to extrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). Intrinsic evidence consists of the patent claims, specifications, and prosecution history. *Id.* Extrinsic evidence consists of expert testimony, inventor testimony, dictionaries, technical treatises and articles. *Id.* at 1584. In most instances the court will be able to construe the claims with only the aid of intrinsic evidence. If this is the case, then resort to extrinsic evidence is improper. *Id.* at 1583. But, "there will be instances in which intrinsic evidence is insufficient to enable the court to determine the meaning of the asserted claims, and in those instances, extrinsic evidence, ... [may] be relied on to understand the technology and to construe the claims." *Id.* at 1584 (citing *Markman*, 52 F.3d at 979). Extrinsic evidence is *only* to be used to aid the court in understanding the technology and the terms, not to vary, limit or expand the claim terms themselves. *Markman*, 52 F.3d at 981 (emphasis added).

The first step in claim construction is to look to the language of the claims themselves. *No. American Vaccine*, 7 F.3d at 1575. Claim terms should first be given their ordinary and accustomed meaning. *Transmatic, Inc. v. Gulton Industries, Inc.*, 53 F.3d 1270, 1277 (Fed.Cir.1995).

The second step in interpretation is to look to the specification for claim definitions. "The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979. It is a general rule that limitations and embodiments in the specification will not be transferred to the claims themselves, but that the specification works only as an interpretation tool. *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861, 867 (Fed.Cir. 1985).

■ It is well-established that an inventor is allowed to be his own lexographer. If his definition, however, is different than that held by people of ordinary skill in the art, 35 U.S.C. § 112 requires him to spell out such differences clearly in the specification. *Markman*, 52 F.3d at 980. The public should be able to read a patent and know

from the patent document itself what the inventor has protected in the process. Therefore, if the inventor has used a term in a different way, it must be written concisely in the specification in order to be construed into the claims.

■ Third, examination of the prosecution history may show limitations or redefinition of the claim terms during the prosecution of the patent. Prosecution history consists of all records of proceedings at the PTO including any representations made to the examiner by the inventor or his counsel. *Jonsson v. Stanley Works,* 903 F.2d 812, 817 (Fed.Cir. 1990). "Prosecution history is especially important when the invention involves a crowded art field, or when there is a particular prior art that the applicant is trying to distinguish." *Lemelson,* 968 F.2d at 1206.

Arguments made by the inventor or his patent counsel during the prosecution of the patent are relevant to claim construction. *Jonsson,* 903 F.2d at 818. Analysis of the prosecution history is the only stage in which the intent of the inventor may be visible and relevant to claim construction. *Markman,* 52 F.3d at 985. But as with the specification, prosecution history cannot be used to enlarge, diminish or vary the claims themselves, but shall only be used for interpretation purposes. *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1438 (Fed.Cir.), *cert. denied,* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988).

In summary, a court must read the terms of the claims with respect to the other claims, specifications and prosecution history in order to give meaning to the entirety of the patent. *Beachcombers,* 31 F.3d at 1161; *Jonsson,* 903 F.2d at 819. The claims, however, are to be construed, not reworked. *Intervet,* 887 F.2d at 1053.

■ Disputes among the parties with respect to the claims in the '098 patent do not preclude summary judgment on the issue. *Markman,* 52 F.3d at 981; *Transmatic,* 53 F.3d at 1278 (citing *Intellicall, Inc. v. Phonometrics,* 952 F.2d 1384, 1386 (Fed.Cir.1992). Conflicting expert testimony on the meaning of the claim terms does not create a credibility problem for the court. *Markman,* 52 F.3d at 981; *see also Kersavage v. United States,* 36 Fed.Cl. 441 (1996) (citing *Howes v. Medical Components, Inc.,* 814 F.2d 638, 643 (Fed.Cir.1987)). Testimony from the parties' experts with regard to the meaning and scope of claim terms is legal opinion. A court can give deference and accept the expert's opinion, or the expert opinion can be used for guidance, or when appropriate a court may ignore or exclude the testimony. The "focus in construing disputed terms is an objective test of what one skilled in the art would have understood the terms to mean" and not a subjective fact-specific inquiry. *Markman,* 52 F.3d at 986; *see also Loctite,* 781 F.2d at 867.

## Claim 1

Claim 1 in the '098 patent reads as follows:

1. An organo-metallic process for producing an epitaxial film of Group III–V semiconductor disposed on a single crystal substrate, said process employing an open reactor and comprising the steps of:

heating said substrate in said open reactor, introducing into said open reactor a fist [sic] material containing a hydride or halide-free alkyl compound of at least one Group V constituent of said semiconductor, and, as a second material, at least one halide-free alkyl compound containing at least one of the Group III constituents of said semiconductor,

and

exhausting said open reactor to pressure not greater than one atmosphere.

■ In order to construe the claims for validity and infringement purposes, it is necessary to break complex claims into their essential elements. Rockwell contends claim 1 is composed of: (1) use of Group III alkyl compound, (2) use of Group V alkyl or hydride, (3) to grow epitaxial films of semiconductor material, (4) on a single crystal substrate. Defendant United States lists the following elements: (1) an organometallic process, (2) for producing an epitaxial film of Group III–V semiconductor, (3) on a single crystal substrate, (4) in an open reactor, (5) using a hydride or halide-free alkyl Group V material, and (6) a halide-free alkyl Group

III material. SDL additionally would limit the claim by striking the single crystal substrate element and by adding a "cold-wall reactor" limitation to the open reactor element.

Claim No. 1 contains a preamble and lists three steps:

(1) A process of heating in an open reactor. An open reactor being one that is exhausted to no greater than one atmosphere.

(2) The first material added to the reactor being a hydride or halide-free alkyl of at least one Group V material.

(3) The second material added to the reactor being a halide-free alkyl of at least one Group III material.

■ SDL argues that it is basic patent law that generally a preamble does not limit the claim. Citing *DeGeorge v. Bernier*, 768 F.2d 1318, 1322 n. 3 (Fed.Cir.1985). Rockwell, however, points out that *Corning Glass Works* states that "[n]o litmus test can be given with respect to when the introductory words of a claim, the preamble, constitute a statement of purpose for a device, or are, in themselves, additional structural limitations of a claim." *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed.Cir.1989). A review of the entirety of a patent requires the preamble to be examined in order to see what the inventor meant to include when composing the claim. If the claim "apart from the introductory clause completely define[s] the subject matter [of the invention], and the preamble merely state[s] a purpose or intended use of the subject matter," then the preamble is given no interpretive effect. *Bell Communications*, 55 F.3d at 620–21. But if the preamble is "essential to point out the invention," it is given effect. *Id.* at 621. The key test is whether or not the preamble "breathes life" into the claim. *In re Stencel*, 828 F.2d 751, 754–55 (Fed.Cir.1987); *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 896 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). No set rule can exclude the preamble, each case is judged on its own patent language and content. *Intervet*, 887 F.2d at 1055.

In the '098 patent, it is apparent that the preamble language does breathe life into the claim language. If the preamble language is not used, there would be no claim limitations regarding the growing of epitaxial films or the type of substrate used in the process. The patent when read in its entirety reads toward the process of the growth of a particular type of film, Group III–V semiconductor, and a certain process for doing that very growth.

■ Claim 1, when read with its preamble, discloses the following elements:

(1) an organometallic process

(2) for producing an epitaxial film of Group III–V semiconductor

(3) on a single crystal substrate

(4) heating the substrate in an open reactor which has been exhausted to no greater than one atmosphere

(5) the first material being a hydride or halide-free alkyl of a Group V element

(6) the second material being a halide-free alkyl of a Group III element.

SDL adds one more limitation on claim 1: (4) would read "heating the substrate in a open *cold-wall* reactor." All parties concede that this limitation should be read into claims 2 and 3; claim 1, however, does not contain the same language. The pertinent language used in the patent that refers to the use of a cold-wall reactor is "single heated zone" in claim 2 and "controlled temperature zone" in claim 3. Rockwell reads claim 1 as being broad enough to encompass hot-wall and cold-wall reactors.

SDL argues that claim 50, which is dependent to claims 1, 4 or 2, limits claim 1 to a single heated zone or cold-wall reactor. Use of dependent claims to define independent claims should be approached cautiously. "While it is true that dependent claims can aid in interpreting the scope of claims from which they depend, they are only an aid to interpretation and are not conclusive. The dependant claim tail cannot wag the independent claim dog." *No. American Vaccine*, 7 F.3d at 1577. " 'Where some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad.' "

*Transmatic,* 53 F.3d at 1277 (quoting *Deere & Co. v. International Harvester Co.,* 658 F.2d 1137, 1141 (7th Cir.), *cert. denied,* 454 U.S. 969, 102 S.Ct. 514, 70 L.Ed.2d 386 (1981)). If claim 50's use of single heated zone language were construed to limit claim 1 to a cold-wall reactor, the dependent claim would be "wagging the independent dog."

Rockwell argues that the doctrine of claim differentiation applies to this case. Rockwell points out that claim differentiation is when different words are used to describe the reactors in claims 1, 2, and 3, these claims are presumed to have different meaning and scope, which difference is likewise presumed to be significant. *United States v. Telectronics, Inc.,* 857 F.2d 778, 783–84 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1046, 109 S.Ct. 1954, 104 L.Ed.2d 423 (1989); *Transmatic,* 53 F.3d at 1277; *Beachcombers,* 31 F.3d at 1162. Rockwell's analysis of the claim differentiation doctrine is correct. "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *See also Tandon Corp. v. U.S. International Trade Comm'n,* 831 F.2d 1017, 1023 (Fed.Cir.1987); *see also Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1538 (Fed. Cir.1991). The doctrine of claim differentiation, however, in view of the materials in the file history, has no application in this case. Use of the doctrine of claim differentiation is unnecessary when the intrinsic evidence is adequate to define and interpret the claims of a patent. *Tandon,* 831 F.2d at 1023–24; *Jonsson,* 903 F.2d at 820.

Claim 1 contains no specific language that limits it to a cold-wall reactor. It contains only language in relation to the "heating of said substrate." The specification contains language relevant to reactor configurations: "a further object of the present invention is to provide a technique ... in a reaction chamber having only one high temperature zone" and "[t]he present invention provides an improved technique ... [which] utilizes a reaction chamber having only one high temperature zone ..." '098 patent 4:45–50 and 3:25–30, respectively. These indications of one temperature zone in the specification and embodiments, however, should not be used to expand or vary limitations found in the claim.

*Intervet,* 887 F.2d at 1053. The specification is to be used as an interpretation tool. *Loctite,* 781 F.2d at 867. Claim 1 has no language into which the specification reactor configurations can be related. The specification, accordingly, is useless in analysis of the cold-wall reactor issue.

The prosecution history is the remaining component of intrinsic evidence. In the prosecution history, Dr. Manasevit has seemed to limit his patent in its entirety to a cold-wall reactor. In the First Office Action the examiner rejected many of the patent claims (including what would be known as claim 1) under 35 U.S.C. § 103 as being unpatentable over the Ruehrwein '084 patent. Dr. Manasevit's response to that First Office Action pointed out that the Ruehrwein '084 patent, among numerous other missing elements, did not contain the element of a single heated zone. In the Third Office Action, the examiner rejected patent claims (one of which was to become claim 1) on the same grounds. Once again, Dr. Manasevit replied that his process is cold-wall and Ruehrwein's is hot-wall. Specifically, Dr. Manasevit's response states:

> Turning now to the Examiner's observation that Ruehrwein discloses that the "substrate is heated in the reaction tube ..." (Action, page 4), it is noted that what the Examiner states is precisely the case—but this is not what the present process discloses. Particularly, in each of the Ruehrwein examples which specifies the apparatus and related process steps, a closed tube is placed in a furnace. This results in the entirety of the tube being heated by the furnace—the so-called "hot wall" type of reaction. *By contrast, the present process discloses the use of a "cold wall" process.* (emphasis added)

The prosecution history leaves no doubt that Dr. Manasevit meant to limit his invention/process to the use of a cold-wall reactor. He had to in order to avoid obviousness under the Ruehrwein patents.

As with the specification, the prosecution history cannot limit the claims themselves but can be used as an interpretation tool. The element of claim 1 that is in question talks about "heating the said substrate."

The question of how to heat the said substrate, requires an answer in which the substrate is heated in a cold-wall system. The specification talks about the configuration of the reactor; the prosecution history talks about the reaction and the process. This sequence leads to an interpretation that incorporates the cold-wall system into claim 1.

Claim 1 must be read as a part of the patent in its entirety. *Beachcombers*, 31 F.3d at 1161. One skilled in the art, reading the patent and its file history, would have concluded that the cold-wall reactor configuration and process was an integral part of all of the independent claims. Additional support for this conclusion is found in the declaration of SDL's expert, in the deposition of Dr. Manasevit, and in Rockwell's admissions to SDL's interrogatories. The interrogatory and answer are as follows:

Interrogatory

State whether you contend that Harold M. Manasevit intended that the following language from Harold M. Manasevit's response to the United States Patent and Trademark Office's September 18, 1980, third office action apply to each of claims 19, 69, and 83 (which issued as claims 1, 2, and 3, respectively): "Particularly, in each of the Ruehrwein examples which specifies the apparatus and related process steps, a closed tube is placed in a furnace. This results in the entirety of the tube being heated by the furnace—the so-called 'hot wall' type of reaction. By contrast, the present process discloses the use of a 'cold-wall' process . . ."

If Harold M. Manasevit did not intend this statement to apply to each of claims 19, 69, and 83 (issued claims 1, 2, and 3, respectively), state which of claims 19, 69, and 83 you contend that Harold M. Manasevit intended the above-quoted language to apply to?

Answer.

Dr. Manasevit understood the statement to apply to each of these claims.

Next, it is necessary to determine the meaning of "cold-wall reactor." The parties differ on their interpretations. SDL wants the definition to be a reactor in which "no significant pyrolysis takes place at the walls."

Rockwell wants the definition to be a reactor in which heat is applied at the site of the substrate/susceptor and the walls are kept cooler than the susceptor. Rockwell is correct in asserting that the difference in definitions is that SDL is asking the court to define the reactor by what it does, and Rockwell wants the court to define the reactor by its configuration.

A "cold-water reactor," as the term is used in patent '098 is defined in the intrinsic evidence. The response to the Third Office Action, that was used to include the cold-wall system into claim 1, incorporated the definition of cold-wall reactor used in the article by Dr. Stringfellow and Hall. In that article, SDL's expert defined a cold-wall system as one "where only the graphite pedestal is heated (by rf induction heating) and the SiO walls remain cool even though no special water or forced air cooling is employed." On the other hand, a hot-wall reactor is one where "the gases are surrounded by hot graphite walls from the point of mixing to the substrate." Incorporation of this definition in the file history provides one skilled in the art the opportunity to look up the article, and conclude that a cold-wall reactor is defined as plaintiff asks—by its geometry not its results. While a cold-wall reactor may have significantly less pyrolysis on the walls of the chamber than the hot-wall reactor, it is the reason to use a cold-wall reactor and not the meaning of a cold-wall reactor. As this definition can be found with only the use of intrinsic evidence, i.e., prosecution history, any further use of extrinsic evidence would be improper. *Vitronics*, 90 F.3d at 1583.

Claim 1, as construed, contains the following elements:

(1) an organometallic process

(2) for producing an epitaxial film of Group III–V semiconductor

(3) on a single crystal substrate

(4) heating the substrate in an open cold-wall reactor which has been exhausted to no greater than one atmosphere. A cold-wall reactor being one that heats the substrate (e.g. by rf heating) while the walls remain cooler than the substrate.

(5) the first material being a hydride or halide-free alkyl of a Group V element

(6) the second material being a halide-free alkyl of a Group III element.

## Claim 2

Claim 2 reads as follows:

2. A process for producing an epitaxial film of a Group III–V semiconductor disposed on a single crystal substrate, said process employing an open reactor having exterior walls defining an interior chamber and comprising the steps of:

> providing a single heated zone within said interior chamber of said open reactor without substantially heating said exterior walls of said reactor,

> heating said substrate in said single, heated zone of said interior chamber of said open reactor, and

> introducing into said reactor a first halide-free material containing at least one Group V constituent of said semiconductor, and, as a second material, at least one halide-free organic alkyl compound containing at least one of the Group III constituents of said semiconductor, and exhausting said open reactor to a pressure not greater than one atmosphere.

Reading the patent language and using the interpretations used for claim 1 as to cold-wall reactors, the elements for claim 2 are:

(1) a process for producing an epitaxial film of Group III–V semiconductor

(2) on a single crystal substrate

(3) heating the substrate in an open cold-wall reactor which has been exhausted to no greater than one atmosphere. A cold-wall reactor being one that heats the substrate (e.g. by rf heating) while the walls remain cooler than the substrate.

(4) the first material being a halide-free Group V element

(5) the second material being a halide-free organic alkyl of a Group III element.

Element 1 is slightly broader in that it does not have to be an organometallic process. All parties agree that claim 2 is limited to a cold-wall reaction. Other differences are found in elements 4 and 5. Whereas in claim 1 the Group V element was restricted to a hydride or halide-free alkyl, in claim 2 it is only a halide-free Group V element. Element 6 narrows claim 1's element in that the halide-free Group III alkyl must be an organic element. The patent language is adequate for construction of claim 2. There is no need to go further into the intrinsic evidence (except for reference to the cold-wall discussion in claim 1) and there is no need to turn to extrinsic evidence.

## Claim 3

Claim 3 reads as follows:

3. An organo-metallic process for producing an epitaxial film of a Group III–V semiconductor directly on a single crystal substrate, said process comprising the steps of:

> providing a first material containing a hydride or alkyl of at least one Group V constituent of said semiconductor,

> providing a second, metal-organic source material comprising at least one organic alkyl compound containing at least one of the Group III constituents of said semiconductor,

> disposing said substrate in an open reactor,

> providing a controlled, elevated temperature zone within only the interior of said reactor for heating said substrate to a required temperature for deposition of said film thereon,

> introducing said first and second materials into said reactor and heating said substrate in accordance with said controlled temperature zone to effect the deposition of an epitaxial film of the Group III–V semiconductor on said substrate.

Claim 3 is construed much like claim 2. There is no argument about the elements on this claim. They are as follows:

(1) an organometallic process

(2) for producing an epitaxial film of Group III–V semiconductor

(3) on a single crystal substrate

(4) the first material being a hydride or alkyl Group V material

(5) the second material being a metal-organic alkyl Group III material

(6) heating the substrate in an open cold-wall reactor. A cold-wall reactor being one that heats the substrate (e.g. by rf heating) while the walls remain cooler than the substrate.

(7) maintaining the temperature of the substrate at the appropriate deposition temperature for the proposed semiconductor.

Claim 3 also is slightly different than claim 1. Element (4) has been broadened to include a hydride or alkyl Group V material. Element (5) is narrowed to include only metal-organic Group III alkyls. The main difference is that element (7) has been added. Element (7) includes a temperature limitation that was not found in the other claims so far discussed. Although it is not a definite temperature, it does limit the range of temperatures to those in which epitaxial deposition of the proposed semiconductor will be successful.

The language alone in the patent is adequate for construction of claim 3. There is no need to go further into the intrinsic evidence (except for reference to the cold-wall discussion in claim 1) and there is no need to turn to extrinsic evidence.

The claims in issue are 1, 2, 3, 11, 35, 40, 44, 50, 55, 56, 57, 58, 66, and 72. Rockwell's motion for summary judgment seeks a decision that claims 1 and 3 are not invalid. Rockwell in its consolidated opposition limited its response to claims 1 and 3, and did not separately defend the validity of the other claims. Construction of claims 1 and 3 requires consideration of the entire patent, including all of its 72 claims. All of the other additional claims at issue are dependent claims. No dispute has been presented about the language of the additional claims at issue. The remaining claims are not complex, and a reading of the claim language does not present terminology that needs clarification or a breakdown into separate elements. For the purpose of brevity, this memorandum will not include an analysis of the separate elements and a detailed construction of the additional claims at issue.

## III

### *Obviousness Defense—35 U.S.C. § 103*

To be patentable, the subject matter of the invention must be nonobvious. The statute, 35 U.S.C. § 103, in relevant part, provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The obviousness defense in section 103 codified in 1952 tests for patentability that had been evolving in judicial precedents since 1851. The Supreme Court in 1966 delineated the factual inquiries that are required for a determination under section 103 of obviousness or nonobviousness of a patent's subject matter. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966).

Obviousness under section 103 is a legal issue, the determination of which involves factual inquiries into: (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the prior art and the claimed invention, and (4) relevancy of indicia of obviousness or nonobviousness present in secondary considerations such as commercial success, long felt but unsolved needs, failure of others, copying, and unexpected results. *Graham*, 383 U.S. at 17, 86 S.Ct. at 693–94; *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1533–40 (Fed.Cir.1983); *Allen Archery, Inc. v. Browning Mfg. Co.*, 819 F.2d 1087, 1092 (Fed.Cir.1987).

In addition to the factual inquiries identified in the *Graham* analysis, determination of the nonobviousness issue involves application of relevant standards established as matters of law. The court can grant, as a matter of law, a motion for summary judgment on patent invalidity when the factual inquiries into

obviousness present no genuine issues of material facts. RCFC 56(c). *Ryko Mfg. Co.,* 950 F.2d at 716.

Under 35 U.S.C. § 282, a patent is presumed valid, and the party attacking validity has the burden of proving facts supporting a conclusion of invalidity by clear and convincing evidence. *American Hoist,* 725 F.2d at 1360. This burden may be more easily met where the challenger produces prior art that is more pertinent than that considered by the Patent and Trademark Office (PTO). *See Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1549 (Fed.Cir.1983). The degree to which a determination that an invention would have been obvious under section 103 involves facts, and is thus subject to the "clearly erroneous" standard of RCFC 52(a), is that degree required to erect a foundation of facts sufficient to support the legal conclusion. *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1568, (Fed.Cir.), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).

■ Although patents are presumed valid, the presumption may be overcome when pertinent prior art was not before the Patent Office. *Preformed Line Products Co. v. Fanner Mfg. Co.,* 328 F.2d 265, 271 (6th Cir.), *cert. denied,* 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51 (1964). In such event, the court must examine the question of validity in view of newly cited art, keeping in mind the admonition against hindsight reasoning. In the event of a failure to proffer prior art more pertinent than that considered by the PTO, there is the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job. *American Hoist,* 725 F.2d at 1359.

The obviousness test under section 103 recognizes that references to the prior art may be combined in order to show that the invention was obvious to one skilled in the art. *In re Gorman,* 933 F.2d 982, 986 (Fed. Cir.1991). When it is necessary to select elements of various teachings in order to form the claimed invention, the court must ascertain whether there is any suggestion or motivation in the prior art to make the selection made by the applicant. *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1143 (Fed.Cir.1985). Obviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching, suggestion or incentive supporting the combination. *See In re Bond,* 910 F.2d 831, 834 (Fed.Cir.1990).

The extent to which such suggestion must be explicit in, or may be fairly inferred from, the references, is decided on the facts of each case, in light of the prior art and its relationship to the applicant's invention. It is impermissible to engage in a hindsight reconstruction of the claimed invention, using the applicant's structure as a template and selecting elements from references to fill the gaps. The references themselves must provide some teaching whereby the applicant's combination would have been obvious. *Interconnect Planning,* 774 F.2d at 1143.

■ The issue of obviousness is determined entirely with reference to a hypothetical person having ordinary skill in the art. It is only that hypothetical person who is presumed to be aware of all the pertinent art. The actual inventor's skill is irrelevant to this inquiry; the statutory emphasis is on a person of ordinary skill. Inventors, as a class according to the concepts underlying the Constitution and the statutes that have created the patent system, possess something—call it what you will—which sets them apart from the workers of ordinary skill, and one should not go about determining obviousness under § 103 by inquiring into what patentees (i.e. inventors) would have known or would likely have done, faced with the revelation of references. *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 454 (Fed.Cir.1985). Whether a particular combination might be "obvious to try" is not a legitimate test of patentability. *In re Geiger,* 815 F.2d 686, 688 (Fed.Cir.1987). Obviousness is tested by "what the combined teachings of the references would have suggested to those of ordinary skill in the art." *In re Keller,* 642 F.2d 413, 425 (C.C.P.A.1981).

### Prior Art References

The parties agree that the relevant prior art includes the Miederer, Scott, and Ruehr-

wein patents. Rockwell contends that the works of Dr. Robert Stearns and Dr. Robert Thomas do not qualify as prior art under any provision of the patent statute. Material issues of fact in dispute preclude resolution by summary judgment procedures whether the works of Drs. Stearns and Thomas qualify as relevant prior art.

### Miederer Patent (U.S. Patent No. 3,226,270)

The application for the Miederer patent was filed on September 24, 1963. The patent teaches that pyrolysis of triethylgallium or trimethylgallium and a Group V reactant in a cold wall reactor will result in gallium arsenide. Gallium arsenide is a III/V semiconductor. Triethylgallium and trimethylgallium are Group III organometallic alkyls. Miederer teaches the use of gallium arsenide rods as the substrate.

### Scott Patent (U.K. No. 778,383)

The Scott patent was published in the United Kingdom on July 3, 1957. The patent encompassed the work of Thomas Roberston Scott, George King, and Jack McCreath Wilson working for Standard Telephones and Cables, Ltd. of the United Kingdom. The Scott patent describes a process which synthesizes indium antimonide by combining triethylindium, an organometallic Group IIIB compound, and stibine, the hydride of the Group VB element, antimony. The Scott patent teaches the use of a single heated zone—a cold-wall reactor. Scott's process is a chemical vapor deposition (CVD) process.

### Ruehrwein Patents (U.S. Patent No. 3,364,084; U.K. No. 1,011,979)

The U.K. Ruehrwein patent was published on December 1, 1965; the U.S. Ruerhwein patent was issued on January 16, 1968. The U.S. patent and the U.K. patent (collectively called the Ruerhwein patents) teach the production of gallium arsenide and the use of arsine and trimethylgallium or triethylgallium in a hydrogen atmosphere. The Ruehrwein patents teach the production of Group III/V alloys containing at least one of the Group III elements gallium, indium, and aluminum, and at least one of the Group V elements arsenic, phosphorus, and antimony. The Ruehrwein patents teach the use of·a germanium substrate.

### SDL's Motion

In its motion for summary judgment on obviousness under section 103, SDL uses precedents that permit references to be combined if one skilled in the art would have incentive for doing so, In re Beattie, 974 F.2d 1309, 1312 (Fed.Cir.1992), and identifies prior art that was not considered by the PTO. Ryco, Inc. v. Ag–Bag Corp., 857 F.2d 1418, 1423 (Fed.Cir.1988). SDL asserts claims 1, 2, 3, 11, 35, 40, 44, 55, and 57 were obvious to one of skill in the art of CVD in 1968 under combination of the art shown in the Miederer, Scott and Ruehrwein patents. SDL addressed the four factual inquiries required in a Graham analysis.

Rockwell, in its opposition to SDL's motion, agrees that the scope and content of the relevant prior art included the Scott, Miederer and Ruerhwein patents, and agrees with SDL's assessment of the level of ordinary skill in the art. Rockwell contends SDL has not carried its burden as to the differences between the prior art and claims 1 and 3, and has not given effect to the clear and convincing evidence standards that apply to secondary considerations.

All parties agree that the Graham analysis will be determinative of obviousness of the '098 patent under section 103. Rockwell states obviousness is a question of law, and summary judgment should be entered upholding the validity of claims 1 and 3, based upon (a) the failure of Miederer and Ruehrwein to achieve the MOCVD process, (b) the success of MOCVD process in filling a long felt need for a process capable of growing gallium arsenide on insulating substrates, (c) extensive licensing of the '098 patent in the business community, (d) acceptance of Dr. Manasevit's work by the scientific community, and (e) SDL's and the United States' copying of the MOCVD process. SDL states there are no genuine factual issues as to any of the Graham obviousness inquiries and summary judgment is appropriate.

### Scope and Content of Prior Art

The key to an obviousness inquiry is whether the hypothetical person of ordinary skill would have found what the inventor did to have been obvious based upon prior art

references. The hypothetical person is presumed to have knowledge of all the prior art reasonably pertinent to the problem addressed by the inventor. *In re Gorman*, 933 F.2d at 986.

To determine if a particular reference is within the scope of the prior art, the court must decide whether the reference is within the "field of the inventor's endeavor. If it is not, then next consider whether the reference is reasonably pertinent to the particular problem with which the inventor was involved." *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 449 (Fed.Cir.1986), *cert. denied*, 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987).

Patent '098, includes in the prior art description statements that identify the inventor's field of endeavor to be the search for better semiconductor materials and process technology. *See* '098 patent 1:29–34. The description of prior art includes the following references on growth techniques:

> In the past, several techniques have been used to grow GaAs from the vapor phase onto GaAs substrates. Two such methods are described in the article entitled "Film–Making: A Delicate Job Performed under Pressure" by Kenneth L. Lawley, *Electronics*, Nov. 13, 1967, beginning at page 114. Col. 2:10–15.

> Moreover, all previous reports of successful vapor phase single crystal GaAs deposition have been on nonelectrically-insulated substrates. A heteroepitaxial composite comprising a continuous film of single crystal III–V compound such as GaAs, GaP or the alloys; e.g., $GaAs_{1-x}P_x$, $Ga_{1-y}Al_yAs$, on a monocrystalline, electrically insulating substrate has not been achieved in the prior art. Col. 2: 54–61.

The Miederer patent, the Scott patent, and the Ruehrwein patents, were all within the field of Dr. Manasevit's endeavor. Just like Dr. Manasevit, the inventors of the Miederer, Scott, and Ruerhwein patents all focused on using CVD methods to grow high-purity and high-quality semiconductor materials. All four references relate specifically to the growth of III/V semiconductors, materials whose utility was just being tapped in the 1960s. Dr. Manasevit researched prior art of III/V CVD in developing his MOCVD process. Patents and journal articles that address this problem would have been within the scope of the pertinent prior art.

Patent '098 lists 12 U.S. patents as references cited. The list includes Ruerhwein's U.S. patent No. 3,218,205, but does not include Ruerhwein's '084 patent. The list does not include Miederer's U.S. patent, nor the U.K. patents of Scott and Ruehrwein. Two publications are referenced in the '098 patent: HANDBOOK OF CHEMISTRY OF PHYSICS (42nd ed. (1961–62), pp. 2681–97, 2700–10; and the Lawley article in ELECTRONICS, Nov. 13, 1967, cited above.

There was an incentive to look to other CVD techniques to obtain learning relevant to the growth of III/V semiconductors. References discussing MBE, VPE, and VPD also were within the field of Dr. Manasevit's endeavor. The prior art scope and content includes the patents of Scott, Miederer and Ruehrwein, and all publications that dealt with the use of CVD, MBE, VPE and VPD that were published prior to February 7, 1967, the date that Dr. Manasevit successfully reduced to practice the MOCVD process.

The following publications are included in the scope and content of the prior art:

> James A. Amick, *The Growth of Single–Crystal Gallium Arsenide Layers on Germanium and Metallic Substrates*, RCA REVIEW 555 (Dec.1963)

> G.R. Antell & D. Effer, *Preparation of Crystals of InAs, InP, GaAs, and GaP by a Vapor Phase Reaction*, 106 J. ELECTROCHEMICAL SOC'Y 509 (June 1959).

> O.T. Beachley & G.E. Coats, *Trimethylgallium. Part V.[1] The Reactions of Trimethylaluminium, -gallium, and -indium with Some Primary and Secondary Phosphines and Arsines*, Art. 591, J.CHEM. SOC'Y 3241 (1965)

> Anton B. Burg & Louis R. Grant, *The Methylstibines and the Monomer Dimethylstibinoborine*, Vol. 81, No. 1, AM. J.CHEM.SOC'Y 1 (1959)

> R.W. Conrad et al., *Reflectivity Studies of Epitaxial $Ga_xIn_{1-x}As$*, Vol. 113, No. 2, J.ELECTROCHEMICAL SOC'Y 287 (1966)

G.R. Cronin et al., *Epitaxial InAs on Semi–Insulating GaAs Substrates,* Vol. 113, No. 12, J.ELECTROCHEMICAL SOC'Y 1336 (1966)

R.E. Ewing & P.E. Greene, *Influence of Vapor Composition on the Growth Rate and Morphology of Gallium Arsenide Epitaxial Films,* Vol. 111, No. 11, J.ELECTROCHEMICAL SOC'Y 1266 (1964)

Ben C. Harrison & Edwin H. Tompkins, *Preparation of Indium Anti-monide and Gallium Arsenide Films,* Vol. 1, No. 4. INORGANIC CHEMISTRY 951 (1962)

J.P. Hirth, et al., *Theory of Nucleation* in SINGLE CRYSTAL FILMS, 18–19, Proc. Internt'l Conf. Philco Scientific Labs (Maurice H. Francombe & Hirosho Sato ed., 1964)

M.G. Jacko & S.J.W. Price, *The Pyrolysis of Trimethyl Gallium,* 41 CANADIAN J. CHEMISTRY 1560 (1963).

B.A. Joyce, *The Chemical Vapour Deposition of Single-crystal Films,* THE USE OF THIN FILMS IN PHYSICAL INVESTIGATIONS 87 (J.C. Anderson, ed., Academic Press 1966)

J.R. Knight, et al., *The Preparation of High Purity Gallium Arsenide by Vapour Phase Epitaxial Growth,* 8 SOLID STATE ELECTRONICS 178 (1965)

H.M. Manasevit, et al., *Growth of Single Crystal Silicon on Beryllium Oxide,* 236 TRANSACTIONS OF THE METALLURGICAL SOC'Y OF AIME 275 (1966)

Henry T. Minden, *The Preparation and Properties of GaAs–InAs Mixed Crystals,* Vol. 112, No. 3, J.ELECTROCHEMICAL SOC'Y 300 (1965)

R.R. Moest & B.R. Shupp, *Preparation of Epitaxial GaAs and GaP Films By Vapor Phase Reaction,* Vol. 109, No. 11, J. ELECTROCHEMICAL SOC'Y 1061 (1962)

D.W. Pashley, *The Nucleation, Growth, Structure and Epitaxy of Thin Surface Films,* VOL. XIV, NOS. 53–56, ADVANCES IN PHYSICS 327 (B.R. Coles, ed., Taylor & Francis Ltd., London 1965).

J.L. Richards, et al., *Epitaxy of Compound Semiconductors by Flash .Evaporation,* 34 J. OF APPLIED PHYSICS 3418 (1963).

H.A. Skinner, *The Strengths of Metal–to–Carbon Bonds,* in ADVANCES IN ORGANOMETALLIC CHEMISTRY 49 (F.G.A. Stone & Robert West eds., 1964).

Kenzi Tamaru, *The Decomposition of Arsine,* 59 J.PHYSICAL CHEMISTRY 777 (1955).

James J. Tietjen & James A. Amick, *The Preparation and Properties of Vapor–Deposited Epitaxial* $GaAs_{1-x}P_x$ *Using Arsine and Phosphine,* Vol. 113, No. 7, J.ELECTROCHEMICAL SOC'Y 724 (1966)

### Differences Between the Prior Art and the Claims at Issue

Rockwell contends that SDL's obviousness challenge does not include "a single piece of prior art reporting the growth of gallium arsenide (or any other III/V semiconductor) single crystals using organometallic reagents." Rockwell continues that the lack of any teaching in the prior art that single crystal films of III/V semiconductor materials may "successfully be grown" is dispositive as to obviousness.

■ Obviousness standards under section 103 do not require such a showing. Invalidity based on obviousness requires a showing that the prior art viewed as a whole would have suggested the claimed process to one skilled in the art, here the CVD art. *In re Napier,* 55 F.3d 610, 613 (Fed.Cir.1995); *Stratoflex,* 713 F.2d at 1537. Prior art references may be combined to show that the claimed invention was obvious to one skilled in the art. The motivation to combine can be found either expressly or impliedly from the part as a whole. *In re Beattie,* 974 F.2d at 1312; *Cable Elec. Prods., Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1025 (Fed.Cir.1985).

Rockwell does not identify specifically any element of claims 1 and 3 of the '098 patent that cannot be found in the prior art. Rockwell, instead, contends that one skilled in the art would not have been motivated to develop the process contained in claims 1 and 3. Each element of the process, however, is taught by the combination of the Miederer, Scott, and Ruehrwein patents, or elsewhere in the CVD prior art.

Dr. Manasevit's field of endeavor was a search for better semiconductor materials and process technology. During the 1960's, those skilled in the art knew that a number of problems existed with Group III halide processes. The Scott patent and other references recognized that halides would attack the reactor and lead to contamination in growing films. Group III halides often resulted in "autodoping," a phenomenon whereby halide atoms from the Group III constituents would react with atoms in the substrate, which resulted in loss of control over the growth process. Pre–1967 publications report this problem with halide CVD. The Group III sources used in the halide processes needed to be held at much higher temperatures than the Group III alkyls used in the Scott and Miederer patents, making the halides more difficult to handle. These problems with the halide processes would have motivated those skilled in the art to implement the Scott and Miederer processes.

One skilled in the art would have been motivated to combine the Scott and Miederer patents with other art. Rockwell does not dispute that one skilled in the art of CVD in 1967, when implementing the Scott and Miederer patents, would have been motivated to grow single crystal material and would have understood the need to use a single crystal substrate to do so. By 1967, both the advantages of single crystal growth and the need for a single crystal substrate were well known.

In support of its cross-motion for summary judgment, SDL submitted the following Obviousness Claims Chart. This chart summarizes information in the declaration of SDL's expert, and purports to show where each element of claims 1 and 3 of the '098 patent is found in the Miederer, Scott, and Ruehrwein patents. Rockwell did not discuss this chart or identify any errors therein. The text of the provisions referenced in the right column is contained in the relevant charts in Appendix A; the text of the examples cited is omitted.

The Obviousness Claims Charts show the Miederer, Scott and Ruerhwein patents, when combined, contain all of the elements included in claims 1 and 3 of the '098 patent.

## Obviousness Claim Chart

### Claim 1

| U.S. Patent No. 4,368,098—Manasevit | U.S. Patent No. 3,226,270—Miederer<br>U.K. Patent No. 778,383—Scott<br>U.S. Patent No. 3,364,084—Ruehrwein<br>U.K. Patent No. 1,011,979—Ruehrwein |
| --- | --- |
| Preamble:<br>An organo-metallic process . . . | Miederer, claim 1; col. 3:49–50;<br>Scott, claims 9, 12, 13; 2:126–30;<br>Ruerhwein, U.S., col. 1:56–59;<br>Ruerhwein, U.K., 1:54–59, Example 12. |
| . . . for producing an epitaxial film . . . | Miederer, col. 1:59–64;<br>Scott, 7:44–47;<br>Ruerhwein, U.S.: claim 1;<br>Ruerhwein, U.K., 1:15–18. |
| . . . of Group III–V semiconductor . . . | Miederer, claim 1;<br>Scott, claims 9, 12, 13; 2:128–3:12;<br>Ruerhwein, U.S., claim 1;<br>Ruerhwein, U.K., 1:15–18; 1:44–47; 2:39–50;<br>Examples 1–18. |
| . . . disposed on a single crystal substrate,<br>. . . | Miederer, col. 1:54–63;<br>Scott, 7:43–47; |

| | Ruehrwein, U.S.: 1:30–32; 3:10; 3:16; 3:50–53; Examples 1–9; Ruehrwein, U.K., 1:24–25; 1:41–42; 2:126–3:10; 8:65; Examples 1–18. |
|---|---|
| ... said process employing an open reactor and ... | Miederer; col. 2:22–54; figure; Scott: 4:37–50; figure 3; Ruehrwein U.S.: col. 2:69–3.9; 6:5–7; Ruehrwein U.K.: 2:82–83; 4:79–81. |
| PROCESS STEPS: ... comprising the steps of: heating said substrate in said open reactor ... | Miederer: col. 1:67–70; 2:14–17; 2:70–3:6; Scott: 2:33–47; 2:1'18–3:12; 4:120–5.3; 5:24–34; Ruerhwein U.K.L. 4:73–81; |
| ... introducing into said open reactor ... | Miederer: claim 1; Scott: claim 9; Ruerhwein U.S.: col. 3:8–14; Ruerhwein U.K.: 2:82–89. |
| ... a first material containing a hydride or halide-free alkyl compound of at least one Group V constituent of said semiconductor ... | Miederer: col. 3:50–53; Scott: claims 9, 12, 13; 2:126–3:12; Ruehrwein U.S.: col. 1:51–59; Ruehrwein U.K.: 1:54–59; 1–64–66; Example 12. |
| ... and exhausting said open reactor to pressure not greater than one atmosphere. | Miederer: col. 2:26–60; figure; Scott: 4:37–65; 5:35–36; 5:74–75 Ruehrwein U.S.: col. 3:4–7. |

## Obviousness Claim Chart

### Claim 3

| U.S. Patent No. 4,368,098—Manasevit | U.S. Patent No. 3,226,270—Miederer U.K. Patent No. 778,383—Scott U.S. Patent No. 3,364,084—Ruehrwein U.K. Patent No. 1,011,979—Ruehrwein |
|---|---|
| PREAMBLE: An organo-metallic process for producing an epitaxial film of a Group III–V semiconductor directly on a single crystal substrate, ... | *See cites for Preamble to Claim 1.* |
| PROCESS STEPS: ... said process comprising the steps of: providing a first material containing a hydride or alkyl of at least one Group V constituent of said semiconductor, ... | Miederer: col. 3:50–53; Scott: claims 9, 12, 13; 2:130–3:12; Ruehrwein U.S.: 1:55–62; Ruehrwein U.K.: 1:69–73. |
| ... providing a second, metal-organic source material comprising at least one organic alkyl compound containing at least one of the Group III constituents of said semiconductor, ... | Miederer: col. 3:49–50; claim 1; Scott: claims 9, 12, 13; 2:130–3:12; Ruehrwein U.S.: col. 1:51–59; Ruehrwein U.K.: 1:54–59; 1:64–66' Example 12. |
| ... disposing said substrate in an open reactor, ... | Miederer: col. 1:67–70; Scott: 4:117–125; 5:24–46; |

| | |
|---|---|
| | Ruerhwein U.S.: col. 3:8–12;<br>Ruerhwein U.K.: 2:82–87. |
| ... providing a controlled, elevated temperature zone within only the interior of said reactor for heating said substrate to a required temperature for deposition of said film thereon, ... | Miederer: col. 2:70–3:6;<br>Scott: claims 9, 12, 13; 5:24–34. |
| ... introducing said first and second materials into said reactor and heating said substrate in accordance with said controlled temperature zone to effect the deposition of an epitaxial film of the Group III–V semiconductor on said substrate. | Miederer: claim 1; col. 1:59–64; 1:67–70; 2:14–17; 2:70–3:6;<br>Scott: 2:33–47; claim 9; 7:44–47; 8:67–72; 5:24–34;<br>Ruerhwein U.S.: col. 3:8–14; 1:33–35;<br>Ruerhwein U.K.: 2:82–89; 1:15–18; claim 1. |

---

### Level of Ordinary Skill in Pertinent Art

The primary value in the requirement that level of skill be found lies in its tendency to focus the mind of the decision maker away from what would presently be obvious to that decision maker and toward what would, when the invention was made, have been obvious as the statute requires, 'to one of ordinary skill in the art.' *Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1574 (Fed.Cir. 1986). All parties agree that one of ordinary skill (1) would have a college and perhaps a graduate degree, (2) a knowledge of chemistry, (3) experience with CVD giving one the appreciation of the requirements for epitaxy and how to handle materials in an apparatus, and (4) familiarity with molecular beam epitaxy (MBE), vapor phase epitaxy (VPE), and vapor phase deposition (VPD). This hypothetical person would have knowledge of all art within the scope and content of the prior art. *In re Gorman,* 933 F.2d at 986.

### Relevant Indicia in Secondary Considerations

In its motion for summary judgment that claims 1 and 3 are not invalid, plaintiff premised its nonobviousness argument on indicia in secondary considerations: consensus of the scientific community that credited Dr. Manasevit as the inventor of MOCVD, plaintiff's successful licensing of its MOCVD patent, SDL's use of an MOCVD process derived from work of Dr. Manasevit, and general recognition and acclaim of the advantages of the MOCVD process. These secondary indicia of nonobviousness subsequently were rephrased as: the success of the MOCVD process in filling a long felt need for a process capable of growing gallium arsenide on insulating substrates, the extensive licensing of patent '098 by the MOCVD business community, acceptance of Dr. Manasevit's work by the MOCVD scientific community and SDL's and United States' copying of the MOCVD process.

■ These secondary conditions are factors to be considered, but in themselves are not controlling. *Vandenberg v. Dairy Equipment Co.,* 740 F.2d 1560, 1567 (Fed. Cir.1984); *Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567, 1576 (Fed.Cir.1984). Objective evidence of nonobviousness may in a given case be entitled to more or less weight, depending on its nature and its relationship to the merits of the invention. It may be the most pertinent, probative, and revealing evidence available to aid in reaching a conclusion on the obviousness issue. When present it should always be considered as an integral part of the analysis. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1555 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). Inquiries into indicia of secondary considerations may assist in the analysis of technological matters presented in patent litigation. *Graham,* 383 U.S. at 36, 86 S.Ct. at 703.

■ Secondary considerations include: 1) long-felt need; 2) commercial success; 3) acquiescence of licensees; 4) the

reaction of those skilled in the art to the invention; 5) evidence of copying; 6) progress of the patent through the PTO; and 7) simultaneous invention. Donald S. Chisum, PATENTS § 5.05. The secondary considerations serve to help the court to determine the state and skill of the art at the time of the invention. As a consequence, a party using secondary considerations to rebut prima facie obviousness must demonstrate a nexus between a given consideration and the merits of the invention. *In re Paulsen*, 30 F.3d 1475, 1482 (Fed.Cir.1994); *Stratoflex*, 713 F.2d at 1539.

Rockwell does not show how the secondary considerations apply to the merits of the invention. The nexus criterion is not satisfied.

### Simultaneous Invention

Evidence that several persons working in the same art each independently arrive at the same solution to the operative problems at roughly the same time mitigates strongly toward a finding that the solution was obvious. *Concrete Appliances Co. v. Gomery*, 269 U.S. 177, 185, 46 S.Ct. 42, 45, 70 L.Ed. 222 (1925); *Clarke v. K–Mart*, 481 F.Supp. 470, 473 (W.D.Pa.1979), *aff'd*, 639 F.2d 772 (3rd Cir.1980). An independent conception need not be prior art. Donald S. Chisum, PATENTS § 5.05[7].

The work of Drs. Stearns and Thomas may not qualify as prior art. Their work however, indicates simultaneous invention. Each obtained epitaxial growth working independently of the others, as well as Dr. Manasevit, in the mid–1960s. *See Wilson Athletic Goods Mfg. Co. v. Kennedy Sporting Goods Mfg. Co.*, 233 F.2d 280, 282 (2d Cir.1956); *Graham v. Jeoffroy Mfg., Inc.*, 206 F.2d 769 (5th Cir.1953).

In 1965, Dr. Robert Stearns, an employee of Monsanto Company, was working on an organometallic process to create Group III/V semiconductors. Dr. Stearns achieved single crystal growth in July 1965. Rockwell agrees that the Stearns process was MOCVD. There are material issues of fact as to whether his work was reduced to practice.

Dr. Robert Thomas was a civilian employee of the Rome Air Development Center at Griffins Air Force Base, Rome, New York, and a graduate student at Syracuse University in the summer of 1966. He was experimenting with silicon crystal growth and its use in semiconductor devices. Dr. Thomas proposed a graduate research project that would use organo-metallics to grow Group III/V semiconductor films. He achieved epitaxial growth of gallium phosphide on September 17, 1968. He published his results in 1969, and received his Ph.D. in 1970. All parties agree that Dr. Thomas' work includes all elements of claims 1 and 3 of the '098 patent. There are material issues of fact as to credibility of assertions relative to conception and as to whether he was diligent in the reduction to practice of his MOCVD process.

Rockwell never denies that Dr. Stearns and Dr. Thomas developed MOCVD, and Dr. Manasevit states that their work was MOCVD. Within a few years all three men, Manasevit, Stearns and Thomas, invented the same process. This circumstance is particularly forceful because it shifts the focus of the obviousness inquiry from conjecture as to what "would have been obvious" to one skilled in the art, to acknowledgement of what "actually was done." It shows that the invention of MOCVD was a "product only of ordinary mechanical or engineering skill and not of inventive genius." *Concrete Appliances*, 269 U.S. at 185, 46 S.Ct. at 45.

### Long Felt Need

In the motion papers, Rockwell's position is ambiguous. Rockwell agrees with SDL's expert that, given the state of Group III/V epitaxy during the mid to late 1960's, there was no perceived need for a new process for growing Group III/V semiconductors. Rockwell asserts that the ordinary artisan of the 1960's was perfectly happy with the conventional halide and hydride processes, with no motive to try different materials, such as organo-metallics. The reason for Dr. Manasevit's work on MOCVD according to Rockwell was because, unlike the average artisan, he had a perceived need for a new process for growing Group III/V semiconductors. Rockwell and its expert also argue that there was a long felt need that was satisfied when

Dr. Manasevit improved his process. They point to no evidentiary facts to support this opinion. Rockwell should choose one of the positions it takes.

SDL and defendant United States argue there was a need to improve semiconductors. Whether this need was long felt or not is a question, but not one of material fact.

*Licensing Program*

██ Rockwell argues that the existence of its licensing program demonstrates industry wide acceptance of the validity of the patent. Rockwell neither explains how the existence of its 1990s licensing program has anything to do with the validity of a patent for an invention made in the 1960's, nor why a host of other intervening factors would not have entered into a party's decision to take a license.

A look at the list of licensees, the costs of those licenses, and the circumstances of the negotiations, paints a clear picture. Most of the licensees are small players in niche markets or overseas conglomerates for whom the cost of litigation would far outweigh the cost of a license. The licensees were faced, moreover, with a "submarine" patent that took a decade and a half to issue and laid fallow several years more before Rockwell began to press for licenses. By that time, many licensees had operations underway.

Courts often refuse to give substantial weight to licensing programs as indicia of nonobviousness, especially when the licensees are smaller producers or companies for whom the cost of litigation would be onerous:

> When ... the PTO issues a patent because the examiner did not consider prior art teaching the very technique essential to the claimed invention ... it is not unusual to see astute businessmen capitalize on it by erecting a temporarily successful licensing program thereon. Such programs are not infallible guides to patentability. They sometimes succeed ... because of business judgments that it is cheaper to take licenses than to defend infringement suits....

*EWP Corp. v. Reliance Universal Inc.,* 755 F.2d 898, 907–08 (Fed.Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985).

The evidence indicates that Rockwell's licensees took licenses because of the later intervening work of Drs. Dapkus and Dupuis showing that MOCVD could produce useful devices. An "intervening event to which success must be attributed [may] ... detract from the probative value of the evidence of that success." *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1000 (Fed.Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). Here, the publication of the patented process by Dr. Manasevit and Mr. Simpson did not lead to any major commercial use of MOCVD. Such interest did not occur until the Dapkus and Dupuis work of the late 1970s revolutionized MOCVD. Rockwell's licenses may be a tribute to the work of Drs. Dapkus and Dupuis.

Rockwell's licensing program is not persuasive as evidence of nonobviousness.

*Copying*

Rockwell accuses defendant United States of copying MOCVD in contract specifications for Government procurements of night vision equipment. Copying is an objective indicium of nonobviousness, where some nexus exists between the copying and the claimed invention. Generally, such copying takes place at or near the time the invention is introduced, thus tending to show that an ostensibly obvious invention was not so obvious at the time of its invention. *See e.g., Windsurfing,* 782 F.2d at 1000. That is not the case here. To the extent the Government could be said to "copy" the MOCVD process, it did so only decades after the advent of the technology and only after millions of dollars of investment, Dapkus & Dupuis' seminal work, and substantial further development of the process. These intervening events, and many others, break any link between the Government's specifications for night vision equipment in the 1980s and the state of CVD art in 1967.

Rockwell must show the nexus. Rockwell has not and cannot offer any evidence to show the use in the 1980s was related to the invention in the 1960s. Failure to establish a valid nexus removes any substance from Rockwell's copying charge as tending to show nonobviousness.

### Reaction of Scientific Community

Rockwell argues that the consensus of the scientific community, as expressed in articles and treatises, is indicative of the nonobviousness of his invention. The credit given by the MOCVD workers to Dr. Manasevit as the pioneering father is said to be significant in itself.

Rockwell quotes an article written in the 1970's by SDL's expert as evidence that Dr. Manasevit conducted the "first" MOCVD experiments. In rebuttal, SDL asserts that when the statements were made, its expert was unaware of the work of Miederer, Scott, and Stearns, and that nobody else in the scientific community was aware of their work either.

Rockwell does not dispute the fact that the scientific community was unaware of the work of Dr. Miederer, Dr. Scott, et al., and Dr. Stearns. No significance should be attached to the contention that the scientific community's statements recognized Dr. Manasevit's contribution. The testimony of SDL's expert is true and undisputed: he had no knowledge of Dr. Miederer's work (or that of Scott, et al., and Dr. Stearns) when he referred to the "first experiments" by Manasevit and his coworkers. Neither did others in the scientific community when they made similar statements.

■ Only the scientific community's reaction to the invention and its contribution to the art, not its opinions as to who is the inventor of any contribution is relevant as a secondary consideration under section 103. *See In re Wood*, 599 F.2d 1032, 1036 (C.C.P.A.1979). Dr. Manasevit's publication of his work, and Rockwell's efforts to promote his work has paid off in terms of community recognition. Rockwell presents no evidence, however, that the scientific community was aware of the works of Scott, Miederer and Ruerhwein. The scientific community was not fully informed.

The evidence fails to show a nexus to the original invention. The citations show that Dr. Manasevit is recognized as the first to write in certain journals on the subject. No evidence offered by Rockwell shows citation to the patent or to the process.

The motions of SDL and defendant United States for summary judgment on obviousness under 35 U.S.C. § 103 must be allowed.

## IV

### Novelty and Anticipation—35 U.S.C. § 102 and § 112

■ The validity issue includes an examination to determine compliance with the conditions for patentability in 35 U.S.C. § 102. Rockwell's motion for summary judgment asserts claims 1 and 3 are not invalid under section 102; SDL and defendant United States cross-motions for summary judgment seek rulings that the '098 patent was anticipated under the Miederer, Scott, and Ruehrwein patents and by the works of Drs. Stearns and Thomas.

The section 102 validity issues require analysis of the Miederer, Scott, and Ruehrwein patents. The analysis involves determinations as to compliance with the provisions in the statute, as well as a determination of whether the information in the record permits disposition of the anticipation issues under summary judgment standards. Material issues of fact are in dispute that preclude disposition by summary judgment procedures of compliance with the section 102 conditions.

The cross-motions for summary judgment on this aspect of the validity issue center on sections 102(a), (b), and (g), and the enabling requirements in 35 U.S.C. § 112.

35 U.S.C. § 102 (1994) in relevant part reads:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year

prior to the date of the application for patent in the United States, or

\* \* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 112 (1994) in relevant part reads:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention....

 Anticipation is a question of fact. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1565 (Fed.Cir.1992); *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed.Cir.1991); *Chester v. Miller*, 906 F.2d 1574, 1576 (Fed. Cir.1990); *Allen Archery, Inc. v. Browning Manufacturing Co.*, 819 F.2d 1087, 1091 (Fed.Cir.1987). Determination of whether a claimed invention has been anticipated under section 102 requires answers to three questions of fact: (1) whether the challenging reference is prior art; (2) whether the doctrine of identity applies; and (3) whether the prior art is enabling.

(1) To qualify as prior art in this case, the item in dispute may be a patent issued, a publication printed, or work of another inventor conceived, reduced to practice and not abandoned, suppressed, or concealed, prior to February 7, 1967, the date Dr. Manasevit successfully reduced to practice the MOCVD process. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576–78 (Fed.Cir.1996); *Del–Mar*

*Eng'g Lab. v. United States*, 207 Ct.Cl. 815, 524 F.2d 1178, 1184 (Ct.Cl.1975). Rockwell has conceded that the Miederer patent, the Scott patent, and the Ruehrwein patents are prior art references under sections 102(a) and (b) for the summary judgment cross-motions. Qualification as prior art under section 102(g) standards is more difficult. The art there applicable is not in a self-contained printed format. Instead, the claimed prior art is evidenced by notes, testimony, and actions of other inventors about their work. Material issues of fact in dispute preclude summary disposition of whether the works of Drs. Stearns and Thomas qualify as prior art under section 102(g).

(2) For the court to find anticipation, each element of the accused claim must be found either expressly or inherently in a single prior art reference or embodied in its entirety in a single prior art practice. *Kalman v. Kimberly–Clark Corporation*, 713 F.2d 760, 771 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). The rule is well established as "that which infringes, if later, would anticipate, if earlier." *Knapp v. Morss*, 150 U.S. 221, 228, 14 S.Ct. 81, 84, 37 L.Ed. 1059 (1893). If even one element is missing from the prior art, there can be no finding of anticipation. *Kalman*, 713 F.2d at 772; *Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc.*, 726 F.2d 724, 726–27 (Fed.Cir.1984).

For defendant United States and SDL's motions for summary judgment to be allowed, the record must show that all elements in claims 1 and 3 are found within a single prior art source. The Federal Circuit requires these elements to be proved by clear and convincing evidence. *See Price v. Symsek*, 988 F.2d at 1191. Clear and convincing evidence is that which leaves the trier of fact with "an abiding conviction that the truth of a actual contention is 'highly probable.' " *Id.*

(3) For the challenging reference to be enabling, the facts must put the "allegedly disclosed matter in the possession of the public." *Akzo N.V. v. U.S. International Trade Comm'n*, 808 F.2d 1471, 1479 (Fed. Cir.1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). Prior art

patent references are presumed enabled. *In re Sasse,* 629 F.2d 675, 681 (C.C.P.A.1980). Rockwell bears the burden of proving that any of the issued patents referenced by SDL and defendant United States that qualify as prior art are not enabled.

On the question of enablement in an anticipation analysis, Rockwell and SDL differ on whether insubstantial differences between the prior art and claims 1 and 3 can be remedied by use of knowledge or persons skilled in the art at the time to fill the gaps. Rockwell cites for support *Structural Rubber Products v. Park Rubber Co.,* 749 F.2d 707, 716 (Fed.Cir.1984). SDL supports its position by citing *In re Donohue,* 766 F.2d 531, 533 (Fed.Cir.1985).

*Structural Rubber Products* involved an appeal from a judgment based on invalidity for lack of novelty under section 102 and the denial of appellant's motion for judgment notwithstanding the verdict (JNOV). Legal errors, confusing jury instructions, and lack of evidence to support the conclusion of invalidity based on lack of novelty, resulted in reversal of the section 102 holding; the judgment was vacated and the case was remanded for further instructions. *In re Donohue* involved an appeal from the PTO Board of Appeals anticipation rejection under section 102 after additional information was submitted to the PTO in the form of an affidavit. In prior proceedings, the PTO had rejected the claims as anticipated under section 102 by another patent. The additional information asserted that the invention disclosed in the other patent had not actually been made. The enablement requirement is analyzed in the context of issue preclusion, and the status of extrinsic evidence relative to unsuccessful attempts to make the invention.

It is clear that neither case is apposite to the parties' section 102 enablement assertions in this case. *Structural Rubber Products* is concerned with the doctrine of claim identity and section 103 obviousness. Enablement as applicable to section 102 in *In re Donohue* involves facts that differ from the facts relative to Rockwell's enablement assertions.

The section 102 enablement issue in this case is whether the Miederer, Scott, or Ruehrwein patents sufficiently describe Dr. Manasevit's invention so as to place the public in possession of the invention on the basis of a combination by a person with ordinary skill in the art of the patent terms with his own knowledge. Neither *Structural Rubber Products* nor *In re Donohue* address the enablement question in this case.

Factual information in the motion papers on claim identity and enablement comes from the terms of the prior patents themselves and from supplementary information presented primarily through the declarations and referenced exhibits of the principal experts used by Rockwell and SDL. Additional information is presented in extracts of deposition testimony, responses to interrogatories and declarations from other individuals familiar with the inventors and their work. Notwithstanding the volume of the information that is additional to the patent language, the record before the court does not furnish information sufficient to resolve factual questions on claim identity and enablement.

Resolution of disputed factual matters involves: credibility of witnesses on times of conception, and specific basis for each of the experts' opinions on enablement. Additional illumination of such matters would be provided by cross-examination, which could elicit precision on the experts' contentions and on the validity of their opinions. Accordingly, anticipation under section 102 cannot be resolved on summary judgment.

There are disputed factual issues as to the Miederer patent on the questions of claim identity and enablement. SDL's claims comparison chart (see Appendix) shows all elements of claims 1 and 3 may be found in their entirety within the Miederer patent. Rockwell argues the Miederer patent does not contain the required single crystal substrate. The Miederer patent teaches the use of gallium arsenide rods as the substrate. The question of whether the Miederer patent contains the single crystal substrate element is a dispute of fact that is material.

Rockwell emphasizes that the Miederer declaration demonstrates his process and disclosed reactor was unable to produce a single crystal semiconductor. In the declaration,

Dr. Miederer admits his process grew only polycrystalline material, but asserts that if a knowledgeable person used his basic chemistry and added adjustments of process parameters, heating source, and arsine purity, epitaxial single crystalline semiconductors could be produced. The question of whether the terms of Miederer patent provides a sufficient basic chemistry information to enable one skilled in the art to achieve epitaxial single crystalline semiconductors, presents a material issue of fact that needs to be clarified with further ventilation through expert testimony.

As to the Scott patent, there is a disputed issue of fact on the question of enablement. Rockwell's enablement argument centers on single crystalline versus polycrystalline growth. Rockwell, through statements of its expert, asserts that using the Scott patent language would not enable a knowledgeable person to produce epitaxial films, that defendants ignored completely reported failures to grow single crystalline film, and the fact that the heating system described in the patent would likely not give epitaxial growth, no matter the operator's skill. SDL, through its expert, asserts otherwise. There is a genuine dispute of material fact as to whether the patent terms provide sufficient basic chemistry information to enable one skilled in the art to grow epitaxial single crystalline semiconductors.

As to the Ruehrwein patent, there are disputed factual issues on the questions of claim identity and enablement. Rockwell contends that the Ruehrwein patents do not specifically disclose Group III alkyls in combination with alkyls or hydrides of the Group V element, and that Miederer's attempt to use the process disclosed in his patent to grow single crystal gallium arsenide produced only polycrystalline material. Rockwell emphasizes that Ruehrwein's only attempt at single growth using organo-metallics failed. SDL's claim comparison chart shows all elements of claims 1 and 3 within the Ruehrwein patents.

On the question of enablement, Rockwell shows that SDL's expert in his deposition stated that organometallic pyrosis in a hot wall chamber would not create single crystal-line epitaxy. Rockwell's expert states that anyone using Ruehrwein is doomed to failure as shown by example 12 of the Ruehrwein patents. The information in the summary judgment papers is not sufficient to resolve the differences in expert opinion.

Whether Dr. Stearns' work, which admittedly was MOCVD, was reduced to practice involves deciphering laboratory notes and resolving differences in expert opinion as to the results of experiments. Rockwell's expert analyzed the laboratory notes to conclude they show polycrystal, not single crystal growth of gallium phosphide, and that the bulk of record evidence shows failed attempts at epitaxy. Dr. Stearns states he did achieve single crystal growth in 1965. SDL contends the laboratory notes show he reached epitaxy in July 1965 and on numerous other occasions.

The information in the record is not sufficient to resolve the question of whether Dr. Stearns' experiments were more successful that Dr. Manasevit's, or to resolve the interpretation of the laboratory notes as to whether the process produced single crystal semiconductors on the dates as stated by Dr. Stearns or as disputed by Rockwell's expert.

All parties agree that Dr. Thomas' work includes all elements of claims 1 and 3. The only issue is whether his work qualifies as prior art. There are two questions involved in the section 102(g) analysis. (1) Did Dr. Thomas conceive the MOCVD process prior to Dr. Manasevit? and (2) Was he diligent in reduction to practice of his MOCVD process?

In the motion papers, Rockwell asserts a September 27, 1966, conception date for Dr. Manasevit. That date is the date Dr. Manasevit's purchase order for triethylgallium was approved. The only proof that Rockwell offers as corroboration of the date is the purchase order itself and the testimony of Dr. Manasevit's technical assistant. SDL contends Rockwell has offered no evidence, corroborated or not, to support a conception date prior to the success date, February 7, 1967. The extracts of deposition testimony of Dr. Manasevit indicates there is no documentary corroborating evidence that the purchase order was for the MOCVD experi-

ments. Extracts of the deposition testimony of the technical assistant is inclusive as to whether Dr. Manasevit had a definite concept on the purchase order date. The information contained in the motion papers is not sufficient to resolve the question of fact as to the date of conception by Dr. Manasevit.

SDL and defendant United States offer evidence that Dr. Thomas' conception date was as early as September 14, 1966, and as late as November 28, 1966. Corroboration for these dates consists of a letter to Dr. Thomas and his journal entries on October 10 and November 28, 1966. The journal entries were not witnessed nor signed. It is uncertain whether the letter shows the project was sufficiently advanced to be "a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue?" *Burroughs Wellcome Co. v. Barr Laboratories, Inc.*, 40 F.3d 1223, 1228 (Fed.Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996).

There is no question among the parties that Dr. Thomas reduced his MOCVD process after Dr. Manasevit. Dr. Thomas' success occurred on September 17, 1968. Dr. Manasevit demonstrated success of the MOCVD process on February 7, 1967.

In order to establish conception, the parties must show by clear and convincing evidence that the idea, process, or method was firm enough and permanent enough in the inventor's mind so that he could explain the process to one skilled in the art and that person would understand the method. *Burroughs Wellcome Co.*, 40 F.3d at 1228. "An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue ... [A]n inventor need not know that his invention will work for conception to be complete. He need only show that he had the idea; the discovery that an invention actually works is part of its reduction to practice." *Id.* [citations omitted]. The inventor must prove his conception by corroborating evidence; conception will not stand on his testimony alone. *Id.; Price*, 988 F.2d at 1194. Corroboration is really only needed

for oral testimony. *Mahurkar*, 79 F.3d at 1577. Physical evidence will carry its own weight. *Id.*

A "rule of reason" analysis applies to a decision of whether the conception (and reduction to practice) has been established through corroboration. *Mahurkar*, 79 F.3d at 1577; *Price*, 988 F.2d at 1195. "Under a rule of reason analysis, 'an evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached.'" *Mahurkar*, 79 F.3d at 1577 (citing *Price*, 988 F.2d at 1195).

This issue is one of fact that may not be resolved on summary judgment. Corroboration is a credibility question. Credibility is a fact issue that should not be resolved on summary judgment. *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Scripps Clinic and Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1578 (Fed.Cir.1991).

## CONCLUSION

On the basis of the foregoing:

1. Rockwell's motion for summary judgment on claims 1 and 3 of the '098 patent is denied.

2. SDL's cross-motion for summary judgment, that claims 1 and 3 of the '098 patent are invalid because they were anticipated under 35 U.S.C. § 102, present genuine issues of material fact, and, therefore, is denied.

3. Defendant United States' cross-motion for summary judgment, that claims 1 and 3 of the '098 are invalid under 35 U.S.C. § 102, present genuine issues of material fact, and, therefore, is denied.

4. SDL's cross-motion for summary judgment that claims 1 and 3 of the '098 patent are invalid because of obviousness under 35 U.S.C. § 103 is allowed. SDL's cross-motion for summary judgment that claims 2, 11, 35, 40, 44, 50, 55, 56, 57, 58, 66 and 72 of the '098 patent were rendered obvious by the prior art is allowed as a matter of law because Rockwell's counsel elected not to litigate those claims.

5. Defendant United States' cross-motion for summary judgment that claims 1 and 3 of the '098 patent are invalid because of obviousness under 35 U.S.C. § 103 is allowed. Defendant United States' cross-motion for summary judgment that claims 2, 11, 35, 40, 44, 55–58 and 72 of the '098 patent were rendered obvious by the prior art is allowed as a matter of law because Rockwell's counsel elected not to litigate those claims.

6. SDL and defendant United States are entitled to judgment. The Clerk is directed to dismiss the complaint. No costs.

## APPENDIX A

The claims charts on the Miederer, Scott, and Ruehrwein patents were prepared by SDL to support its contention that the '098 patent was anticipated and therefore invalid under 35 U.S.C. § 102. The text of the patent provisions set forth in the right column was selected in support of SDL's anticipation argument. Additional patent provisions that apply to obviousness under 35 U.S.C. § 103 are set forth under each chart.

### I

### Miederer Patent

| Manasevit 4,368,098 | Claim 1 | Miederer 3,226,270 |
|---|---|---|

(a) **PREAMBLE:**

An organo-metallic process . . .

Claim 1. The method of crucible-free production of gallium arsenide rods, which comprises . . . blowing into the vessel and into contact with the heated rod a gas mixture of hydrogen, *triethyl gallium* and arsenic trichloride . . . whereby the *triethyl gallium* and arsenic trichloride are thermally dissociated and gallium arsenide is precipitated upon the core rod . . .

. . . Another specific suitable alkyl gallium compound is $Ga(CH_3)_3$ Col. 3:49–50.

. . . for producing an epitaxial film . . .

. . . precipitating gallium arsenide upon a core rod up to a desired diameter, with the result that *the finished rod can be sliced into wafers or otherwise subdivided substantially in the manner applied in the production of semiconductor components of germanium or silicon.* Col. 1:59–64.

. . . of Group III–V semiconductor . . .

Claim 1. The method of crucible-free production of *gallium arsenide* rods . . .

. . . disposed on a single crystal substrate, . . .

. . . precipitating gallium arsenide upon a core rod up to a desired diameter, with the result that *the finished rod can be sliced into wafers or otherwise subdivided substantially in the manner applied in the production of semiconductor components of germanium or silicon.* Col. 1:59–64.

. . . said process employing an open reactor and . . .

The illustrated reactor vessel 11 comprises a quartz tube 12 having for example 120 mm. length and 300 mm. diameter, a conical ground and a ground neck portion 13 at each end. The reactor vessel is closed

APPENDIX A—Continued

| Manasevit 4,368,098 | Claim 1 | Miederer 3,226,270 |
|---|---|---|

by a top cover 14 and a bottom portion 15. *Gas inlet nipples* 16 are mounted in the cover portion 14. *Gas outlet nipples* 17 are provided in bottom portion 15. The center of the top portion and the center of the bottom portion is provided with an insulating sleeve 18 for mounting and holding the core rod 19 of gallium arsenide. This insulating sleeve hermetically seals the rod at the locality where it passes through the outside of the vessel. The core rod is joined with electric contact 200 at both ends outside of the reactor structure. The contactors are connected with a current source 28 by means of which a heating current is directly passed lengthwise through the rod for the purpose of heating it up to the desired temperature. A controlled resistor of adjustable resistance is preferably connected in the electric circuit for adjusting and maintaining the proper temperature of the rod. A current of hydrogen is supplied from the storage container 20 through an alkyl-gallium container 21. The hydrogen current, laden with the gaseous alkyl gallium then passes through a flow meter 22. Another hydrogen storage container 23 serves for supplying a current of hydrogen through a container 24 partly filled with arsenic trichloride $AsCl_3$. The amount of the $AsCl_3$ which evaporates together with the hydrogen passes through a flow meter 25. *The two gas currents are mixed and passed through the inlet nipples 16 into the reactor vessel.* Col. 2:22–54.

See also Figure in Miederer Patent.

**PROCESS STEPS:**

... comprising the steps of: heating said substrate in said open reactor, ...

A core rod of gallium arsenide is mounted in an enclosed reaction vessel of quartz or quartz glass and is *heated* to a temperature between 100 and 600 C. Col. 1:67–70.

... and this is preferably done by passing electric current lengthwise through the gallium-arsenide rod. Col. 2:16–17.

The reactor is surrounded by a heat exchanger jacket 27 which permits *maintaining the reactor wall at a temperature below the dissociation temperature of the alkyl galliums and the arsenic compounds* but above the condensation temperatures of these compounds. The cooling jacket 27 is provided with inlet and outlet nipples for liquid coolant by means of which *the wall temperature is preferably adjusted from 50 to 90° C.* Col. 2:70–3:6.

APPENDIX A—*Continued*

| Manasevit 4,368,098 | Claim 1 | Miederer 3,226,270 |

... introducing into said open reactor ...

... *blowing into the vessel* and into contact with the heated rod a gas mixture of hydrogen, triethyl gallium and arsenic trichloride at a flow rate of 0.5 to 50 liters per hour, whereby the triethyl gallium and arsenic trichloride are thermally dissociated ... Col. 4:7–11.

... a fist [sic] material containing a hydride or halide-free alkyl compound of at least one Group V constituent of said semiconductor ...

Examples of suitable arsenic compounds are *alkyl arsenic—trimethyl arsine*, arsenic-alkyl-halogenides—AsRCl$_2$, AsR$_2$Cl; arsenic-alkyl-hydrides—AsRH$_2$, AsR$_2$H: *arsenic-hydrides—arsine.* In all cases, R = CH$_3$ or—C$_2$H$_5$. Col. 3:50–53.

... and, as a second material, at least one halide-free alkyl compound containing at least one of the Group III constituents of said semiconductor ...

Claim 1. The method of crucible-free production of gallium arsenide rods, which comprises ... blowing into the vessel and into contact with the heated rod a gas mixture of hydrogen *triethyl gallium* and arsenic trichloride ... whereby the *triethyl gallium* and arsenic trichloride are thermally dissociated and gallium arsenide is precipitated upon the core rod.

... Another specific suitable alkyl gallium compound is *Ga(CH$_3$)$_3$.* Col. 3:49–50.

... and exhausting said open reactor to pressure not greater than one atmosphere.

The illustrated reactor vessel 11 comprises a quartz tube 12 having for example 120 mm. length and 300 mm. diameter, a conical ground and a ground neck portion 13 at each end. The reactor vessel is closed by a top cover 14 and a bottom portion 15. Gas inlet nipples 16 are mounted in the cover portion 14. Gas outlet nipples 17 are provided in bottom portion 15. The center of the top portion and the center of the bottom portion is provided with an insulating sleeve 18 for mounting and holding the core rod 19 of gallium arsenide. This insulating sleeve hermetically seals the rod at the *locality* where it passes through the outside of the vessel. The core rod is joined with electric contact 200 at both ends outside of the reactor structure. The contactors are connected with a current source 28 by means of which a heating current is directly passed lengthwise through the rod for the purpose of heating it up to the desired temperature. A controlled resistor of adjustable resistance is preferably connected in the electric circuit for adjusting and maintaining the proper temperature of the rod.

A current of hydrogen is supplied from the storage container 20 through an alkyl-gallium container 21. The hydrogen current,

APPENDIX A—Continued

| Manasevit 4,368,098 | Claim 1 | Miederer 3,226,270 |
|---|---|---|

laden with the gaseous alkyl gallium then passes through a flow meter 22. Another hydrogen storage container 23 serves for supplying a current of hydrogen through a container 24 partly filled with arsenic trichloride AsCl$_3$. The amount of the AsCl$_3$ which evaporates together with the hydrogen passes through a flow meter 25. The two gas currents are mixed and passed through the inlet nipples 16 into the reactor vessel. Col. 2:22–54.

See also Figure in Miederer Patent.

| Manasevit 4,368,098 | Claim 3 | Miederer 3,226,270 |
|---|---|---|

(b) **PREAMBLE:** *See cites for Preamble to Claim 1.*

An organo-metallic process for producing an epitaxial film of a Group III–V semiconductor directly on a single crystal substrate, . . .

**PROCESS STEPS:**

. . . said process comprising the steps of: providing a first material containing a hydride or alkyl of at least one Group V constituent of said semiconductor, . . .

Examples of suitable arsenic compounds are *alkyl arsenic—trimethyl arsine* ; arsenic-alkyl-halogenides—AsRcl$_2$, AsR$_2$Cl; arsenic-alkyl-hydrides—AsRH$_2$, AsR$_2$H; *arsenic-hydrides—arsine.* In all cases, R = —CH$_3$ or —C$_2$H$_5$. Col. 3:50–53.

. . . providing a second, metal-organic source material comprising at least one organic alkyl compound containing at least one of the Group III constituents of said semiconductor, . . .

Claim 1. The method of crucible-free production of gallium arsenide rods, which comprises . . . blowing into the vessel and into contact with the heated rod a gas mixture of hydrogen, *triethyl gallium* and arsenic trichloride . . ., whereby the *triethyl gallium* and arsenic trichloride are thermally dissociated and gallium arsenide is precipitated upon the core rod . . .

Another specific suitable alkyl gallium compound is *Ga(CH$_3$)$_3$.* Col. 3:49–50.

. . . disposing said substrate in an open reactor, . . .

*A core rod of gallium arsenide is mounted in an enclosed reaction vessel* of quartz or quartz glass and is heated to a temperature between 100 and 600 C. Col. 1:67–70.

. . . providing a controlled, elevated temperature zone within only the interior of said reactor for heating said substrate to a required temperature for deposition of said film thereon, . . .

The reactor is surrounded by a heat exchanger jacket 27 which permits *maintaining the reactor wall at a temperature below the dissociation temperature of the alkyl galliums and the arsenic compounds* but above the condensation temperatures of these compounds. The cooling jacket 27 is provided with inlet and outlet nipples for liquid coolant by means of which *the*

APPENDIX A—Continued

| Manasevit 4,368,098 | Claim 3 | Miederer 3,226,270 |
|---|---|---|

*wall temperature is preferably adjusted from 50 to 90° C.* Col. 2:70–3:6.

... introducing said first and second materials into said reactor ...

... *blowing into the vessel* and into contact with the heated rod a gas mixture of hydrogen, triethyl gallium and arsenic trichloride at a flow rate of 0.5 to 50 liters per hour, whereby the triethyl gallium and arsenic trichloride are thermally dissociated ... Col. 4:7–10.

... and heating said substrate in accordance with said controlled temperature zone ...

A core rod of gallium arsenide is mounted in an enclosed reaction vessel of quartz or quartz glass and is *heated* to a temperature between 100 and 600 C. Col. 1:67–70.

... and this is preferably done by passing electric current lengthwise through the gallium-arsenide rod. Col. 2:16–17.

The reactor is surrounded by a heat exchanger jacket 27 which permits *maintaining the reactor wall at a temperature below the dissociation temperature of the alkyl galliums and the arsenic compounds* but above the condensation temperatures of these compounds. The cooling jacket 27 is provided with inlet and outlet nipples for liquid coolant by means of which *the wall temperature is preferably adjusted from 50 to 90° C.* Col. 2:70–3:6.

... to effect the deposition of an epitaxial film of the Group III–V semiconductor on said substrate.

... precipitating gallium arsenide upon a core rod up to a desired diameter, with the result that the *finished rod can be sliced into wafers or otherwise subdivided substantially in the manner applied in the production of semiconductor components of germanium or silicon.* Col. 1:59–64.

(c) Additional provisions applicable to obviousness:

It is an object of our invention to provide a method of economically producing gallium arsenide rods of crystalline constitution and high purity by pyrolytic or thermal dissociation of gaseous substance and thereby growing a ... 1:54–56

... The gallium arsenide core is preferably heated and maintained at a temperature of 400° C., ... 2:14–16

The alkyl and arsenic compounds become dissociated at the heated gallium arsenide core, and gallium arsenide is precipitated upon the core. The residual gas passes through an absorption vessel 29 for recovering gallium and arsenic compounds. 2:55–60

Claim 1. The method of crucible-free production of gallium arsenide rods, which comprises heating a gallium-arsenide core rod in an enclosed reaction vessel of quartz material by passing electric current lengthwise through the rod, maintaining the rod at a temperature between 100° and 600° C.; blowing into the vessel and into contact with the heated rod a gas mixture of hydrogen, triethyl gallium and arsenic trichloride at a flow rate of 0.5 to 50 liters per hour, whereby the triethyl gallium and arsenic trichloride are thermally dissociated and gallium arsenide is precipitated upon the core rod and doping the precipitating layer of GaAs

by introducing a doping agent selected from the group consisting of alkyl-zinc, alkyl-cadmium, alkyl-selenium and alkyl-tellurium into the reaction vessel concomitantly with the reaction compounds.

## II

### Scott Patent

| Manasevit 4,368,098 | Claim 1 | Scott 778,383 (U.K.) |

(a) **PREAMBLE:**
An organo-metallic process . . .

Claim 9. A process for making a semi-conducting alloy of a first element and a second element which comprises flowing a mixed stream of gaseous compounds comprising a hydride of said second element and a *compound of said first element* chosen from the group consisting of hydrides, carbonyls and *lower alkyls* . . .

Claim 12. A process as claimed in Claim 9, in which the said *first element is one of the elements in group IIIB of the periodic table* and the said second element is one of the elements in group VB of the periodic table.

Claim 13. A process as claimed in Claim 12, in which said first element is indium, the gaseous compound of said element is *indium triethyl,* said second element is antimony and the gaseous compound of said second element is *stibine.*

. . . process for producing an epitaxial film . . .

The silicon thus produced may be *deposited upon the molten surface of a seed of mono-crystal* of silicon and thus a *mono-crystal may be grown.* 7:44–47.

. . . of Group III–V semiconductor . . .

The process according to the invention may be further extended to manufacture an alloy of an element of Group IIIB of the periodic table with an element of Group VB of the periodic table. Such alloys are known to have semiconducting properties but are difficult to prepare by known methods. 2:118–125.

In the case of these elements the gaseous compound used may be a lower alkyl or a carbonyl. Thus indium triethyl is a liquid which may be drawn off under reduced pressure to form a gas, and mixed with stibine (antimony hydride). The mixture is passed into an enclosure containing a surface heated to at least 200° C., the normal decomposition temperature of stibine when at full saturation. Indium triethyl decomposes around its boiling point at normal pressure viz about 170° C., and *indium antimonide* may thus be formed on the said surface. 2:128–3:12.

APPENDIX A—Continued

Manasevit 4,368,098 Claim 1 Scott 778,383 (U.K.)

Claim 12. A process as claimed in Claim 9, in which the said first element is one of the elements in group IIIB of the periodic table and the said second element is one of the elements in group VB of the periodic table.

... disposed on a single crystal substrate, ...

... material may be deposited upon *a seed* ... 2:25

... to occur upon the surface of *a seed* ... 2:116.

The silicon thus produced may be *deposited upon the molten surface of a seed of mono-crystal* of silicon and thus a mono-crystal may be grown. 7:43–47.

It has recently been sated that compounds or alloys of a metal of group IIIB with a metal of group VB are semiconductors and the method of the present invention can be used to produce such materials. 8:67–72.

... said process employing an open reactor and ...

A tap 15 is opened to cause inert gas from a source 14 to flow through a chamber 16 the gas being drawn by means of a pump 17. When the chamber 16 is completely filled with the inert gas taps 18 and 19 are opened so that germane or silane from the source 10 and the mixture of germane or silane and phosphine 13 from are drawn through flow meters 20 and 21 into the chamber 16 where heat is applied to decompose the mixture of hydrides. 4:37–50.

*See also* Figures 2, 3.

**PROCESS STEPS:**

... comprising the steps of: heating said substrate in said open reactor, ...

... a process of manufacture of a coherent body of a substantially pure element (other than silicon) *for a semi-conductor* comprises flowing a stream of substantially pure hydride of that element on to a surface located in an enclosure, heating the said surface to a temperature above the decomposition temperature of said hydride ... 2:33–47.

... Thus indium triethyl is a liquid which may be drawn off under reduced pressure to form a gas, and mixed with stibine (antimony hydride). The mixture is passed into an enclosure containing a surface heated to at least 200° C, the normal decomposition temperature of stibine when at full saturation. 2:130–3:12.

The body 28 upon whose upper surface the semi-conductor material is to be deposited

APPENDIX A—Continued

| Manasevit 4,368,098 | Claim 1 | Scott 778,383 (U.K.) |

is supported on a rod 29 and the said surface is heated by inductive coupling to a coil . . . 4:120–124.

The winding 43 may be regarded as inducing electric currents in the concentrator 30, which in turn induces currents in the surface of the seed 28 whereby the said surface is heated. 5:19–23.

The concentrator 30 is water cooled by circulating water through a cooled tube 31, water entering at 32 and leaving at 33. It is necessary to cool the concentrator 30 in order that the *gas mixture shall not be heated to the decomposition temperature until it comes into contact with the surface of the seed crystal 28 so that no gas phase decomposition occurs, a wholly surface reaction being thereby ensured.* 5:24–34.

. . . introducing into said open reactor a first [sic] material containing a hydride or halide-free alkyl compound of at least one Group V constituent of said semiconductor, . . .

Claim 9. A process for making a semiconducting alloy of a first element and a second element which comprises *flowing a mixed stream of gaseous compounds* comprising *a hydride of said second element* and a compound of said *first element chosen from the group consisting of hydrides, carbonyls and lower alkyls,* into a zone containing a surface heated to a temperature above the decomposition temperature of any gaseous compound in the mixture . . .

Claim 12. A process as claimed in Claim 9, in which the said *first element is one of the elements in group IIIB* of the periodic table and the said *second element is one of the elements in group VB* of the periodic table.

Claim 13. A process as claimed in Claim 12, in which said first element is *indium,* the gaseous compound of said element is *indium triethyl,* said second element is *antimony* and the gaseous compound of said second element is *stibine.*

. . . and, as a second material, at least one halide-free alkyl compound containing at least one of the Group III constituents of said semiconductor, . . .

Claim 9. A process for making a semiconducting alloy of a first element and a second element which comprises *flowing a mixed stream of gaseous compounds* comprising *a hydride of said second element* and a compound of said *first element chosen from the group consisting of hydrides, carbonyls and lower alkyls,* into a zone containing a surface heated to a temperature above the decomposition temperature of any gaseous compound in the mixture . . . .

APPENDIX A—Continued

Manasevit 4,368,098 Claim 1 Scott 778,383 (U.K.)

Claim 12. A process as claimed in Claim 9, in which the said *first element is one of the elements in group IIIB* of the periodic table and the said *second element is one of the elements in group VB* of the periodic table.

Claim 13. A process as claimed in Claim 12, in which said first element is *indium,* the gaseous compound of said element is *indium triethyl,* said second element is *antimony* and the gaseous compound of said second element is *stibine.*

... and exhausting said open reactor to pressure not greater than one atmosphere.

A tap 15 is opened to cause inert gas from a source 14 to flow through a chamber 16 the gas being drawn by means of a pump 17. When the chamber 16 is completely filled with the inert gas taps 18 and 19 are opened so that germane or silane from the source 10 and the mixture of germane or silane and phosphine from 13 are drawn through flow meters 20 and 21 into the chamber 16 where heat is applied to decompose the mixture of hydrides. A pressure control valve 41 is interposed between the pump 17 and chamber 16.

A pressure indicator 42 is connected to the decomposition chamber 16 and a surface on which the "doped" semi-conductor material is to be deposited, such as the surface of a seed of silicon or germanium, is located in this chamber and heated to the required temperature. The pressure in the decomposition chamber 16 is regulated by the valve 41 and the relative rate of flow of the gases from the two sources 10 and 13 regulated by valves 18 and 19 to ensure decomposition of the germane or silane and the phosphine substantially wholly upon the heated surface. 4:37–65

The gaseous compounds are drawn through the aperture 37 by means of a vacuum pump (not shown) connected to an outlet pipe with the interposition of a pressure regulating tap 41. 5:35–39.

The pressure in the decomposition zone was 20 mm. Hg. 5:74–75.

*See also* Figures 2, 3.

Manasevit 4,368,098 Claim 3 Scott 778,383 (U.K.)

(b) **PREAMBLE:**

*See cites for Preamble to Claim 1.*

APPENDIX A—Continued

Manasevit 4,368,098 Claim 3 Scott 778,383 (U.K.)

An organo-metallic process for producing an epitaxial film of a Group III–V semiconductor directly on a single crystal substrate, ...

## PROCESS STEPS:

... said process comprising the steps of: providing a first material containing a hydride or alkyl of at least one Group V constituent of said semiconductor, ...

Claim 9. A process for making a semiconducting alloy of a first element and a second element which comprises flowing a mixed stream of gaseous compounds comprising *a hydride of said second element* and a compound of said *first element chosen from the group consisting of hydrides, carbonyls and lower alkyls,* into a zone containing a surface heated to a temperature above the decomposition temperature of any gaseous compound in the mixture, and regulating the proportion of said compounds in said mixture ...

Claim 12. A process as claimed in Claim 9, in which the said *first element is one of the elements in group IIIB of* the periodic table and the said *second element is one of the elements in group VB* of the periodic table.

Claim 13. A process as· claimed in Claim 12, in which said first element is *indium,* the gaseous compound of said element is *indium triethyl,* said second element is *antimony* and the gaseous compound of said second element is *stibine.*

... providing a second, metal-organic source material comprising at least one organic alkyl compound containing at least one of the Group III constituents of said semiconductor, ...

Claim 9. A process for making a semiconducting alloy of a first element and a second element which comprises flowing a mixed stream of gaseous compounds comprising *a hydride of said second element* and a compound of said *first element chosen from the group consisting of hydrides, carbonyls and lower alkyls,* into a zone containing a surface heated to a temperature above the decomposition temperature of any gaseous compound in the mixture, and regulating the proportion of said compounds in said mixture. ...

Claim 12. A process as claimed in Claim 9, in which the said *first element is one of the elements in group IIIB of* the periodic table and the said *second element is one of the elements in group VB* of the periodic table.

Claim 13. A process as claimed in Claim 12, in which said first element is *indium,* the gaseous compound of said element is *indium triethyl,* said second element is *antimony* and the gaseous compound of said second element is *stibine.*

APPENDIX A—Continued

Manasevit 4,368,098 Claim 3 Scott 778,383 (U.K.)

... disposing said substrate in an open reactor, ...

The decomposition chamber 16 is constituted by a cylinder 25 with end plates 26 and 27 sealed to the cylinder 25 in vacuum tight manner. The body 28 upon whose upper surface the semi-conductor material is to be deposited is supported on a rod 29 and the said surface is heated by inductive coupling to a coil 43 which forms a tuned circuit of an induction heating source generating a frequency of approximately 1 Mc/s. 4:117–127.

... surface of the seed 28 is maintained at a constant distance from the concentrator 30. 5:44–46.

... providing a controlled, elevated temperature zone within only the interior of said reactor for heating said substrate to a required temperature for deposition of said film thereon, ...

The concentrator 30 is water cooled by circulating water through a cooled tube 31, water entering at 32 and leaving at 33. It is necessary to cool the concentrator 30 in order that the *gas mixture shall not be heated to the decomposition temperature until it comes into contact with the surface of the seed crystal 28 so that no gas phase decomposition occurs, a wholly surface reaction being thereby ensured.* 5:24–34.

Claim 9. A process for making a semi-conducting alloy of a first element and a second element which comprises flowing a mixed stream of gaseous compounds comprising a hydride of said second element and a compound of said first element chosen from the group consisting of hydrides, carbonyls and lower alkyls, *into a zone containing a surface heated to a temperature above the decomposition temperature of any gaseous compound in the mixture,* and regulating the proportion of said compounds in said mixture ...

... introducing said first and second materials into said reactor and heating said substrate in accordance with said controlled temperature zone to effect the deposition of an epitaxial film of the Group III–V semiconductor on said substrate.

According to one feature of the present invention therefore a process of manufacture of a coherent body of a substantially pure element (other than silicon) for a semi-conductor comprises *flowing a stream of substantially pure hydride of that element on to a surface located in an enclosure, heating the said surface to a temperature above the decomposition temperature* of said hydride and adjusting the rate of flow of said hydride and the pressure in said enclosure to *ensure decomposition of said hydride substantially wholly upon said surface.* 2:33–47.

Claim 9. A process for making a semi-conducting alloy of a first element and a second element which comprises *flowing a*

**APPENDIX A**—Continued

| Manasevit 4,368,098 | Claim 3 | Scott 778,383 (U.K.) |
|---|---|---|

*mixed stream of gaseous compounds* comprising a hydride of said second element and a compound of said first element chosen from the group consisting of hydrides, carbonyls and lower alkyls, *into a zone containing a surface heated to a temperature above the decomposition temperature of any gaseous compound in the mixture,* and regulating the proportion of said compounds in said mixture, the rate of flow of said mixture, and the pressure in said zone to *ensure the decomposition of the compounds substantially wholly on the heated surface, and the deposition thereon in the required proportions of the two elements in said alloy.*

The concentrator 30 is water cooled by circulating water through a cooled tube 31, water entering at 32 and leaving at 33. It is necessary to cool the concentrator 30 in order that the *gas mixture shall not be heated to the decomposition temperature until it comes into contact with the surface of the seed crystal 28 so that no gas phase decomposition occurs, a wholly surface reaction being thereby ensured.* 5:24–34.

The silicon thus produced may be *deposited upon the molten surface of a seed of mono-crystal of silicon and thus a mono-crystal may be grown.* 7:44–47.

... compounds or alloys of a metal of Group IIIB with a metal of Group VB are semi-conductors and the method of the present invention can be used to produce such materials. 8:67–72.

(c) Additional provisions applicable to obviousness:

The process according to the invention may be further extended to manufacture an alloy of an element of Group IIIB of the periodic table with an element of Group VB of the periodic table. Such alloys are known to have semi-conducting properties but are difficult to prepare by known methods.

Some of the elements of group IIIB of the periodic table do not, however, form gaseous hydrides. In the case of these elements the gaseous compound used may be a lower alkyl or a carbonyl. Thus indium triethyl is a liquid which may be drawn off under reduced pressure to form a gas, and mixed with stibine (antimony hydride). The mixture is passed into an enclosure containing a surface heated to at least 200° C., the normal decomposition temperature of stibine when at full saturation. Indium triethyl decomposes around its boiling point at normal pressure viz about 170° C., and indium antimonide may thus be formed on the said surface. 2:118–3:12

... forms a tunnel circuit of an induction heating source generating a frequency of approximately 1 Meis. The electromagnetic field is concentrated on the surface to be heated by a copper concentrator 30 which is in effect the secondary winding of a transformer of which the coil 43 is the primary winding. 4:125–5:3

The concentrator 30 is water cooled by circulating water through a cooled tube 31, water entering at 32 and leaving at 33. It is necessary to cool the concentrator 30 in order that the gas mixture shall not be heated to the decomposition temperature until it comes into contact with the surface of the seed crystal 28, so that no gas phase decomposition occurs, a wholly surface reaction being thereby ensured.

The gaseous compounds are drawn through the aperture 37 by means of a vacuum pump (not shown) connected to an outlet pipe 38, with the interposition of a pressure regulating tap 41.

The rod 29 passes through a vacuum seal 39 in the lower plate 27 and is connected to a mechanism 40 which rotates and lowers it at a rate such that the growing . . . 5:24–43

## III

## Ruehrwein Patents

| Manasevit 4,368,098 | Claim 1 | Ruehrwein 3,364,084 (U.S.) |
| | | 1,011,979 (U.K.) |

(a) **PREAMBLE:**
An organo-metallic process . . .

. . . the various alkyl and halo-alkyl derivatives may similarly be used, e.g., *trimethyl gallium, trimethyl aluminum, trimethyl indium, triethyl gallium,* methyl gallium dichloride, *triethyl aluminum* and triisobutyl aluminum. Col. 1:56–59 (U.S.).

Examples of Group IIIB compounds are boron and gallium trichlorides, tribromides and triiodedes; the alkyl boron and *gallium compounds* such as *trimethyl, triethyl,* tri-n-propryl, tri-isopropyl and tri(tertiary-butyl) boron and *gallium* . . . 1:54–59 (U.K.).

Example 12 (U.K.).

. . . for producing an epitaxial film . . .

Claim 1. Process for the production and deposition of *epitaxial films* of compounds of Group III–B elements . . . and elements selected from Group V–B . . . onto a substrate . . . whereby a purified single crystal form of at least one III–V compound is deposited from said reaction mixture as an epitaxial film on said substrate. (U.S.).

An object of this invention is to provide an improved process for the deposition of *epitaxial films* of Group III–V compounds upon substrates of the same or different materials. 1:15–18 (U.K.).

. . . of Group III–V semiconductor . . .

Claim 1. Process for the production and deposition of *epitaxial films* of compounds of Group III–B elements . . . and elements selected from Group V–B . . . onto a substrate . . . whereby a purified single crystal form of at least one III–V compound is deposited from said reaction mixture as an epitaxial film on said substrate. (U.S.).

APPENDIX A—Continued

| Manasevit 4,368,098 | Claim 1 | Ruehrwein 3,364,084 (U.S.) 1,011,979 (U.K.) |
|---|---|---|
| | | The III–B and V–B compounds of this invention are of unusual purity and have the *necessary electrical properties for use as semiconductor components* ... Col. 1:36–38 (U.S.). |
| | | An object of this invention is to provide an improved process for the deposition of epitaxial films of *Group III–V compounds* upon substrates of the same or different materials. ... 1:15–18 (U.K.). |
| | | The films of *IIIB–VB compounds* produced in accordance with the invention have the necessary *electrical properties for use in semiconductor devices* ... 1:44–47 (U.K.). |
| ... disposed on a single crystal substrate, ... | | ... class of compounds which are characterized as having a *crystalline structure* and existing as well-defined *single crystals*. Col. 1:30–32 (U.S.). |
| | | ... in which the *seed crystal* is located ... Col. 3:10 (U.S.). |
| | | ... the *seed crystal* ... Col. 3:16 (U.S.). |
| | | The most important aspect of this invention is the provision of a means of preparing and *depositing epitaxial films of the purified single crystal material onto various substrates*. Col. 3:50–53 (U.S.). |
| | | ... on a *substrate* of a material having a *cubic crystal structure* ... 11:24–25 (U.K.). |
| | | ... *cubic crystal substrate* ... 1:42 and 3:10 (U.K.). |
| | | ... *seed crystal* ... 8:65 (U.K.). |
| | | This invention involves the preparation and deposition of epitaxial films of single crystal materials discussed above onto various substrates. These deposited films permit the fabrication of electronic devices as indicated hereinafter. The characteristic feature of epitaxial film formation is that starting with a given substrate material, e.g., gallium arsenide, having a certain lattice structure and any orientation, a film, layer or overgrowth of the same or a different material may be deposited from the vapour phase upon the *cubic crystal substrate* ... 2:126–3:10 (U.K.). |
| ... said process employing an open reactor and ... | | The contacting and vapor phase precipitation may be carried out in a closed |

APPENDIX A—Continued

Manasevit 4,368,098 Claim 1 Ruehrwein 3,364,084 (U.S.)
 1,011,979 (U.K.)

system which is completely sealed off after the hydrogen is introduced with the III–B compound and the V–B compound, *or by use of a continuous gas flow system.* The pressure which is obtained in the single-vessel, closed system corresponds to the pressure exerted by the added hydrogen vapor at the operating temperature. The pressure in the system may be varied over a considerable range such as from 0.1 micron to 10 atmospheres, a preferred range being from 0.5 to 1.0 atmosphere. *On a large scale, the present process is operated as a continuous flow system.* Col. 2:69–3:9 (U.S.).

*The present process may be operated as a continuous flow system.* 2:82–83 (U.K.).

The reaction tube is heated to 1000° C and *a stream of hydrogen is directed through the tube* for 15 minutes ... Col. 6:5–7 (U.S.); 4:79–81 (U.K.).

## PROCESS STEPS:
... comprising the steps of: heating said substrate in said open reactor, ...

A polished *seed crystal* of n-type gallium arsenide weighing 2.88 g. and containing $5.8 \times 10^{18}$ carriers/cc. of tellurium dispersed therein is placed in a fused reaction tube located in a furnace. The GaAs seed crystal is placed on a graphite support inside said tube. The reaction tube is *heated to 1000° C. and a stream of hydrogen is directed through the tube* for 15 minutes to remove oxygen from the surface of the GaAs. Col. 6:1–8 (U.S.).

A polished *seed crystal* of n-type gallium arsenide weighing 2.98 g and containing $5.8 \times 10^{18}$ carriers/cc of tellurium dispersed therein is placed upon a graphite support in a fused reaction tube located in a furnace. The reaction tube is *heated to 1000° C and a stream of hydrogen is directed through the tube* for 15 minutes to remove oxygen from the surface of the gallium arsenide crystal. 4:73–81 (U.K.).

... introducing into said open reactor ...

This may constitute a simple reaction tube in which the seed crystal is located and in which the hydrogen gas is then passed to flush oxygen from the system. *Into this tube are passed the III–B and V–B reactants* carried by hydrogen along the same or one or more additional conduits. Col. 3:8–14 (U.S.).

The present process may be operated as a *continuous flow system.* This may consist of a simple reaction tube in which a seed

522

Manasevit 4,368,098 Claim 1 Ruehrwein 3,364,084 (U.S.)
 1,011,979 (U.K.)

crystal is placed and through which hydrogen is then passed to flush oxygen from the system. *Into this tube are passed the Group IIIB and VB reactants* carried along by hydrogen in the same or separate conduits. 2:82–89 (U.K.).

. . . a fist [sic] material containing a hydride or halide-free alkyl compound of at least one Group V constituent of said semiconductor, . . .

The *Group V–B compounds* which are of particular utility include the halides, *hydrides* and *alkyl derivatives of arsenic and phosphorous.* Col. 1:59–62 (U.S.).

The Group VB elements may be used as such when volatile or in the form of their *volatile derivatives.* Among the latter may be mentioned the halides, *hydrides and alkyls of arsenic and phosphorus* . . . 1:69–73 (U.K.).

. . . and, as a second material, at least one halide-free alkyl compound containing at least one of the Group III constituents of said semiconductor, . . .

. . . the various alkyl and halo-alkyl derivatives may similarly be used, e.g., *trimethyl gallium, trimethyl aluminum, trimethyl indium, triethyl gallium,* methyl gallium dichloride, *triethyl aluminum* and trisobutyl aluminum. Col. 1:56–59 (U.S.).

Examples of Group IIIB compounds are boron and gallium trichlorides, tribromides, and triiodides; the *alkyl* boron and *gallium compounds* such as *trimethyl, triethyl,* tri-n-propyl, tri-isopropyl and tri(tertiary-butyl) boron and gallium . . . 1:54–59 (U.K.).

. . . and exhausting said open reactor to pressure not greater than one atmosphere.

The pressure in the system may be varied over a considerable range such as from 0.1 micron to 10 atmospheres, *a preferred range being from 0.5 to 1.0 atmosphere.* Col. 3:4–7 (U.S.).

The total pressure in the system may vary from 0.1 microns to several atmospheres, for example, 7500 mm of mercury. 2:17–19 (U.K.).

Manasevit 4,368,098 Claim 3 Ruehrwein 3,364,084 (U.S.)
 1,011,979 (U.K.)

(b) **PREAMBLE:** *See cites for preamble to Claim 1.*

An organo-metallic process for producing an epitaxial film of a Group III–V semiconductor directly on a single crystal substrate, . . .

**PROCESS STEPS:**
. . . said process comprising the steps of: providing a first material containing a hydride or alkyl of at least one Group V constituent of said semiconductor, . . .

The Group V–B compounds which are of particular utility include the halides, *hydrides and alkyl derivatives of arsenic and phosphorous.* Col. 1:59–62 (U.S.).

APPENDIX A—Continued

Manasevit 4,368,098 Claim 3 Ruehrwein 3,364,084 (U.S.)
 1,011,979 (U.K.)

The Group VB elements may be used as such when volatile or in the form of their volatile derivatives. Among the latter may be mentioned the halides, *hydrides and alkyls of arsenic and phosphorus* ... 1:69–73 (U.K.).

... providing a second, metal-organic source material comprising at least one organic alkyl compound containing at least one of the Group III constituents of said semiconductor, ...

... although the various alkyl and halo-alkyl derivatives may similarly be used, e.g., *trimethyl gallium, trimethyl aluminum, trimethyl indium, triethyl gallium,* methyl gallium dichloride, *triethyl aluminum* and triisobutyl aluminum. Col. 1:55–59 (U.S.).

Examples of Group IIIB compounds are boron and gallium trichlorides, tribromides and triiodides; the *alkyl* boron and *gallium* compounds such as *trimethyl, triethyl,* tri-n-proryl, tri-isopropyl and tri(tertiary-butyl) boron and *gallium* ... 1:54–59 (U.K.).

... disposing said substance in an open reactor, ...

On a larger scale, the present process is operated as a *continuous flow system.* This may constitute *a simple reaction tube in which the seed crystal is located* and in which the hydrogen gas is then passed to flush oxygen from the system. Col. 3:8–12 (U.S.).

The present process may be operated as a *continuous flow system.* This may consist of *a simple reaction tube in which a seed crystal is placed* and through which hydrogen is then passed to flush oxygen from the system. 2:82–87 (U.K.).

... providing a controlled, elevated temperature zone within only the interior of said reactor for heating said substrate to a required temperature for deposition of said film thereon, ...

Rockwell construes claim 3 as covering both cold-wall and hot-wall processes. Second Response to SDL's Interrog. Set 1, Ex. 67 at No. 17. Rockwell concedes that the Ruehrwein Patents teach hot-wall processes. Rockwell Mem. at 19; DenBaars Decl. ¶ 27.

... introducing said first and second materials into said reactor ...

This may constitute a simple reaction tube in which the seed crystal is located and in which the hydrogen gas is then passed to flush oxygen from the system. *Into this tube are passed the III–B and V–B reactants* carried by hydrogen along the same or one or more additional conduits. Col. 3:8–14 (U.S.).

The present process may be operated as a *continuous flow system.* This may consist of a simple reaction tube in which a seed crystal is placed and through which hydrogen is then passed to flush oxygen from

APPENDIX A—Continued

| Manasevit 4,368,098 | Claim 3 | Ruehrwein 3,364,084 (U.S.)<br>1,011,979 (U.K.) |
|---|---|---|

| | | the system. *Into this tube are passed the Group IIIB and VB reactants* carried along by hydrogen in the same or separate conduits. 2:82–89 (U.K.). |
| ... and heating said substrate in accordance with said controlled temperature zone ... | | A polished *seed crystal* of n-type gallium arsenide weighing 2.88 g. and containing $5.8 \times 10^{18}$ carriers/cc. of tellurium dispersed therein is placed in a fused reaction tube located in a furnace. The GaAs seed crystal is placed on a graphite support inside said tube. The reaction tube is *heated to 1000° C. and a stream of hydrogen is directed through the tube* for 15 minutes to remove oxygen from the surface of the GaAs. Col. 6:1–8 (U.S.).<br><br>A polished *seed crystal* of n-type gallium arsenide weighing 2.98 g and containing $5.8 \times 10^{18}$ carriers/cc of tellurium dispersed therein is placed upon a graphite support in a fused reaction tube located in a furnace. The reaction tube is *heated to 1000° C and a stream of hydrogen is directed through the tube* for 15 minutes to remove oxygen from the surface of the gallium arsenide crystal. 4:73–81 (U.K.). |
| ... to effect the deposition of an epitaxial film of the Group III–V semiconductor on said substrate. | | A still further object of this invention is formation and deposition of *epitaxial films* of [Group III–B and Group V–B compounds] upon substrates of the same or different materials. Col. 1:33–35 (U.S.).<br><br>An object of this invention is to provide an improved process for the deposition of *epitaxial films* of Group III–V compounds upon substrates of the same or different materials. 1:15–18 (U.K.).<br><br>Claim 1. A process for the production of an *epitaxial film* ... on a substrate of a material having a cubic crystal structure ... so as to deposit an *epitaxial film* thereon. (U.K.) |

(c) Additional provisions applicable to obviousness:

**Ruehrwein Patent** (U.K. 1,011,979)

Similar compounds of aluminum and indium may be used such as trimethyl, triethyl and triisobutyl aluminiums. 1:64–66

| | |
|---|---|
| BP | 700–1200° C. |
| InP | 500–1000° C. |
| GaJ | 700–1200° C. |
| GaAs | 600–1200° C. |
| InAs | 500–900° C. |
| AlP | 500–1000° C. |
| AlAs | 700–1200° C. |
| InSb | 400–500° C. |
| GaSb | 500–650° C. |

APPENDIX A—Continued

AlSb 700–1000° C.
Bn 800–1200° C.
AlN 600–1200° C.
2:39–50

**Ruehrwein Patent** (U.S. 3,364,084)

Other Group III–B starting materials which are employed in the present invention include the corresponding halides and a[l]kyl compounds of aluminum, gallium and indium. Such metals are preferably employed as the halides, for example, the chlorides, bromides and iodides, . . . 1:51–55

. . . a graphite support inside said tube. The reaction tube is heated to 1000° C. and a stream of hydrogen is directed through the tube for 15 minutes to remove oxygen . . . 6:5–7